Savitri CHIZMAR, individually,

and

Savitri Chizmar, as the natural parent of minors Cynthia Marie Chizmar and Desiree Michelle Chizmar, Appellants,

v.

Scott P. MACKIE, M.D., Appellee.

Nos. S–5232, S–5278.

Supreme Court of Alaska.

May 19, 1995.

C.R. Kennelly, Stepovich Kennelly & Stepovich P.C., Anchorage, for appellant Savitri Chizmar, Individually.

Daniel W. Hickey, Gruenstein, Hickey & Stewart, Anchorage, for appellant Savitri Chizmar, as the natural parent of minors Cynthia Marie Chizmar and Desiree Michelle Chizmar.

Susan Orlansky, Howard A. Lazar and Timothy J. Lamb, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, for appellee.

## ORDER

Before MOORE, C.J. and RABINOWITZ, MATTHEWS and COMPTON, JJ.

On consideration of the petition for rehearing, filed on May 3, 1995,

IT IS ORDERED:

1. Opinion No. 4191, issued on April 28, 1995, is WITHDRAWN.

2. Opinion No. 4209 is issued today in its place.

3. The petition for rehearing is DENIED except that the following sentence is deleted from page 29: "Savitri does not contend that he diagnosed her as having AIDS or even that he diagnosed her as being HIV positive."

Entered by direction of the court at Anchorage, Alaska on May 19, 1995.

EASTAUGH, J., not participating.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, and COMPTON, JJ.

## OPINION

MOORE, Chief Justice.

### I. INTRODUCTION

In this case, Savitri Chizmar, individually and on behalf of her children, filed suit against Dr. Scott Mackie for damages arising from an allegedly negligent misdiagnosis of AIDS. In addition to her claim that the misdiagnosis itself was negligent, she asserts that Dr. Mackie violated the appropriate standard of care by failing to acquire her consent for the HIV test, as well as by informing her husband of the results of the test without her authorization. She seeks damages for her emotional distress resulting from the doctor's actions. She also seeks recovery for economic loss resulting from her divorce, which she claims was occasioned by Dr. Mackie's conduct. In addition, she argues that punitive damages against Dr. Mackie are appropriate. Finally, on behalf of her children, she seeks damages for loss of consortium.

At trial, the superior court directed a verdict against Savitri on the following grounds. First, the court concluded that there was insufficient evidence to warrant presenting the loss of consortium claim to the jury. The court further held that emotional distress damages arising from negligent conduct are not recoverable unless accompanied by physical injury. Finally, the court determined that economic losses resulting from divorce are not recoverable and that Savitri had failed to establish that Dr. Mackie's conduct was sufficiently outrageous to support claims for either punitive damages or intentional infliction of emotional distress.

We reverse the superior court's conclusion that physical injury is required to support a negligent infliction of emotional distress claim. We also reverse the superior court's directed verdict in favor of Dr. Mackie on the children's claim for loss of consortium and, accordingly, vacate the attorney's fee award against the children. We affirm the remainder of the trial court's holdings.

### II. FACTS AND PROCEEDINGS

Savitri Chizmar, a native of Trinidad and Tobago, has lived in the United States since

1980. At the time of the events leading to this action, she was married to Matthew Chizmar. There were two children of this marriage, aged five and seven at the time of the events in question.

In February 1989 Savitri was admitted to Providence Hospital, suffering from pneumonia and gastritis. Dr. Scott Mackie was the admitting physician. Upon her admission, Matthew signed the hospital's standard admission consent form on his wife's behalf, because she was "too sick" for the paperwork. This form states that the patient consents to procedures that may be performed during hospitalization, including laboratory procedures.

While at Providence, Dr. Mackie ordered that a battery of laboratory tests be run on Savitri's blood. As part of this testing, Savitri was tested for HIV/AIDS, using the HIV ELISA screen. Dr. Mackie's basis for ordering the HIV test was Savitri's unexplained and unresolved pneumonia and Dr. Mackie's belief that she was from an island near Haiti. Dr. Mackie did not ask questions of Savitri to clarify whether she was in a high-risk group for AIDS. Dr. Mackie also did not discuss with Savitri the specific tests that were being run and did not inform Savitri that he was testing her for AIDS.

Savitri's initial HIV ELISA screen was found to be "repeatedly reactive." The report stated that confirmatory tests were being performed and that "[n]o interpretation of the patient's HIV antibody status is possible until the confirmatory assay has been completed." Dr. Mackie believed that this result meant that Savitri had tested positive for the HIV virus. Dr. Mackie felt that it was necessary to advise Savitri of the result quickly.

Initially, however, he did not inform Savitri of his conclusion. Instead, he decided to ask her husband to help break the news to her. This decision, he argues, was based on his conclusion that involving the husband would make it easier on Savitri, since her husband clearly knew her better and would be better

at communicating with her.[1] He thereafter contacted Matthew and, according to Matthew and Dr. Mackie's own deposition testimony,[2] informed him that his wife had tested positive for AIDS based on the HIV ELISA screen. At trial, however, Dr. Mackie recalled that he informed Matthew only of a positive test result for HIV that needed to be repeated and further evaluated.

Several days after Matthew and Dr. Mackie informed Savitri of the test result, Dr. Janis, an HIV specialist, examined and interviewed Savitri. Again, there is a conflict as to the substance of this conversation. Dr. Janis concluded that the test result was most likely a "false positive" and testified that he was confident that he had so informed Savitri. However, Savitri testified that she did not recall hearing the term "false positive." Matthew testified that he may have heard the term from Dr. Janis. Dr. Mackie also testified that, prior to Savitri's discharge, he informed her that the test was probably a "false positive" and that she would need to be retested to make sure.

Savitri left the hospital on the day she was informed of the test result. From that point forward, she and her husband experienced a severe escalation of what had been periodic domestic problems and violence. They fought regularly and, on at least one occasion, Matthew allegedly beat Savitri. The fighting further escalated after Matthew tested negative for HIV.

Three weeks after her discharge, Savitri and her husband reviewed her medical records. Included within these records was the discharge summary, which expressly stated "False positive HIV test." The records also included a notation from Dr. Janis concluding that it was likely that the HIV test was a false positive test. Subsequently, in April, a retest established that Savitri did not have AIDS.

Matthew left the marital home in May 1989 and filed for divorce in June, two months after Savitri received the final test

---

1. Dr. Mackie felt that he had some difficulty communicating with Savitri.

2. In his deposition, Dr. Mackie stated: "I told [Matthew] that [Savitri had] had a positive AIDS test, that she needed to be informed, and how would be the best way to inform her."

result establishing that she did not have AIDS. The divorce became final in March 1990. After the divorce, Matthew moved to California.

Savitri, individually and on behalf of her children, filed suit against Dr. Mackie. In her personal action, she alleged that Dr. Mackie did not have Savitri's informed consent to conduct the initial HIV/AIDS test. She also alleged that Dr. Mackie breached his duty of confidentiality owed to Savitri by informing her husband of the test results. The complaint asserted that, as a result of Dr. Mackie's negligence and breach of duty, she suffered damages, including severe emotional distress. Savitri later amended her complaint to encompass Dr. Mackie's allegedly negligent misdiagnosis of AIDS.

In her suit on behalf of her children, Savitri alleged, among other things, that as a result of the above acts by Dr. Mackie, the children

suffered [1] the loss of the continuing love, affection, presence and advice of their father in the household, [2] the loss of the environment in which they have lived, [3] the resultant strain between them and their mother that continues to this time ..., and [4] severe physical and emotional damage, causing them to be confused, uncertain, and at times unhappy, bitter and upset, and in need of professional counseling and help.

In his answer, Dr. Mackie admitted that the initial HIV test was performed without specific consent and that he informed Matthew of the test results.

In September 1991, the superior court, Judge Hunt, entered partial summary judgment in favor of Savitri on the issue of Dr. Mackie's breach of the duty of confidentiality. However, the court concluded that questions of fact remained as to whether Dr. Mackie's breach was justified.

Subsequently, the superior court, Judge Johnstone, granted partial summary judgment to Dr. Mackie, finding that no duty was owed to the children under a negligent infliction of emotional distress claim. The court further held that the children could not recover pecuniary losses or punitive damages and were limited to loss of consortium damages.

Following trial, the court granted a directed verdict for Dr. Mackie. With respect to the children's claims, the court held that "there is insufficient evidence to go to the jury on whether or not either Mrs. Chizmar or Mr. Chizmar were either emotionally or physically disabled in such a way ... to prevent them from giving the consortium ... that parents normally give to their children."

With respect to Savitri's individual claims, the court concluded that economic loss as a result of divorce is not recoverable and that "in the absence of any physical injury, [Savitri's] losses for claimed emotional damage should not be permitted for legal and public policy reasons." The court feared that allowance of such claims could open a "floodgate[ ]" for claims of any misdiagnosis. The court further held that there was insufficient evidence for the jury to conclude that Dr. Mackie had acted with malice or evil intent or that he had an ulterior motive. Thus, the court dismissed Savitri's claim for intentional infliction of emotional distress and for punitive damages.

Savitri now appeals, both individually and on behalf of her children.

## III. DISCUSSION

### A. Standard of Review

In reviewing motions for a directed verdict, this court must "determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable minds could not differ in their judgment." *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978) (citations omitted). We are not to weigh conflicting evidence or judge the credibility of witnesses; "if there is room for diversity of opinion among reasonable people, the question is one for the jury." *Id.*

With respect to questions of law, this court applies its independent judgment and will adopt the rule that is most persuasive in light of precedent, reason, and policy. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

### B. Damages for Emotional Distress

### 1. Damages for emotional distress for misdiagnosis of AIDS in absence of physical injury

■ At trial, the superior court granted a directed verdict against Savitri in part on the ground that damages for emotional distress are unrecoverable where the plaintiff has failed to allege any accompanying physical injury. The court stated:

> While a misdiagnosis of AIDS may be negligent, in the absence of physical injury, the losses for claimed emotional damage should not be permitted for legal and public policy reasons.... [T]here is insufficient evidence that either party suffered other than an emotional loss.... [T]o allow a claim for medical malpractice on the basis of misdiagnosis in the absence of any physical injuries, in this court's opinion, would open up the floodgates for claims for any misdiagnosis.

On appeal, Savitri argues that, under the facts of this case, a claim of physical injury should not be necessary to support recovery of emotional distress damages.[3] We agree and reverse the superior court's grant of a directed verdict on this issue.

■ Under the traditional rule, there is no recovery of damages for emotional distress where the emotional distress arises from negligent conduct and is unaccompanied by physical injury. See Hancock v. Northcutt, 808 P.2d 251, 257 (Alaska 1991); see also Restatement (Second) of Torts § 436A (1965); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 54, at 361 (5th ed. 1984) ("the great majority of courts still hold that in the ordinary case there can be no recovery"). In Hancock, homeowners sued construction contractors for defective concrete work in the construction of their home, alleging, inter alia, breach of contract and negligent infliction of emotional distress. On appeal, we held that a plaintiff may not recover damages for negligently caused emotional distress absent a physical injury, a viable bystander claim,[4] or a breach of contractual duty that, by its nature, "is particularly likely to result in serious emotional disturbance." 808 P.2d at 257–259. Although we declined to reassess the physical injury requirement in Hancock based on the briefing before us, the arguments presented in this case represent a direct challenge to the continued validity of this rule.

The basic assumption underlying the traditional rule is that emotional distress without physical injury is relatively trivial and easily feigned.

> The reasons for the majority rule are, at least, three. One is that emotional disturbance which is not so severe or serious as to have physical consequences is likely to be "so temporary, so evanescent and so relatively harmless" that the task of compensating for it would unduly burden defendants and the courts. The second is that, in the absence of the guarantee of genuineness provided by resulting bodily harm, such emotional disturbance can be too easily feigned or imagined. The third is that where the defendant's conduct has been merely negligent, without any element of intent to harm, his fault is not so great that he should be required to make good a purely mental disturbance.

*Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171, 178–79 (1982) (citing Restate-

---

**3.** In her reply brief, Savitri argues for the first time on appeal that the superior court erred in concluding that she suffered only emotional damages and not physical injury. In support of this argument, she asserts that she was physically beaten by her husband as a result of the AIDS misdiagnosis. Because Dr. Mackie has not had an opportunity to respond to this argument, it is deemed waived. *See Braun v. CFAB*, 816 P.2d 140, 145 (Alaska 1991).

**4.** While a majority of jurisdictions permit a plaintiff to recover for negligently inflicted emotional distress if the plaintiff was in the "zone of danger" created by the defendant's negligent conduct, *see* Restatement (Second) of Torts, §§ 313, 436, 436A (1965), this court has rejected the "zone of danger" test and adopted an interpretation of the guidelines set forth in *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912, 920 (1968). *See Mattingly v. Sheldon Jackson College*, 743 P.2d 356, 365–66 (Alaska 1987) (permitting a plaintiff to recover for emotional distress where the plaintiff observes a loved one, physically injured as a result of the defendant's negligence, "more or less contemporaneously with ... learning of the nature of the victim's injuries"). This rule has no application in the present case.

ment (Second) of Torts, § 436A, cmt. b); *see also* Keeton § 54, at 360–61; *Corgan v. Muehling*, 143 Ill.2d 296, 158 Ill.Dec. 489, 494–95, 574 N.E.2d 602, 607–08 (1991). The limited exceptions to this rule represent isolated situations where courts have found that the special circumstances surrounding a claim for emotional damages serve as a sufficient guarantee that the claim is neither false nor insubstantial. Keeton, § 54; *Allen v. Jones*, 104 Cal.App.3d 207, 163 Cal.Rptr. 445, 450 (1980) (recognizing a cause of action for negligent mishandling of a corpse and stating that "[t]he nature of the wrongful conduct that must be present in this type of case provides sufficient assurance of the genuineness of the claim"); *Western Union Tel. Co. v. Redding*, 100 Fla. 495, 129 So. 743 (1930) (allowing recovery for emotional distress caused by the negligent transmission of a telegram erroneously communicating that the plaintiff's daughter had contracted diphtheria).

However, in recent years, several courts and commentators have criticized the physical injury requirement as an ineffective screening mechanism which is both over and underinclusive. As noted by the California Supreme Court in *Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813 (1980) (en banc):

> [The physical injury requirement] supposedly serves to satisfy the cynic that the claim of emotional distress is genuine. Yet we perceive two significant difficulties with the scheme. First, the classification is both overinclusive and underinclusive when viewed in the light of its purported purpose of screening false claims. It is overinclusive in permitting recovery for emotional distress when the suffering accompanies or results in any physical injury whatever, no matter how trivial. If physical injury, however slight, provides the ticket for admission to the courthouse, it is difficult for advocates of the "floodgates" premonition to deny that the doors are already wide open.... More significantly, the classification is underinclusive because it mechanically denies court access to claims that may well be valid and could be proved if the plaintiffs were permitted to go to trial.

The second defect in the requirement of physical injury is that it encourages extravagant pleading and distorted testimony. Thus it has been urged that the law should provide a remedy for serious invasions of emotional tranquility, "otherwise the tendency would be for the victim to exaggerate symptoms of sick headaches, nausea, insomnia, etc., to make out a technical basis for bodily injury, upon which to predicate a parasitic recovery for the more grievous disturbance, the mental and emotional disturbance she endured."

*Id.*, 167 Cal.Rptr. at 838, 616 P.2d at 820 (citations omitted). Such concerns have prompted a growing number of jurisdictions to abandon the physical injury requirement altogether. *Taylor v. Baptist Medical Ctr.*, 400 So.2d 369, 372–73 (Ala.1981); *Molien v. Kaiser Found. Hosps*, 27 Cal.3d 916, 167 Cal.Rptr. 831, 835–39, 616 P.2d 813, 817–21 (1980); *Montinieri v. Southern New England Tel.*, 175 Conn. 337, 398 A.2d 1180, 1184 (1978); *Rodrigues v. State*, 52 Haw. 156, 283, 472 P.2d 509, 518–21 (1970); *Corgan*, 574 N.E.2d at 608; *Lejeune v. Rayne Branch Hosp.*, 556 So.2d 559, 570 (La.1990); *Gammon v. Osteopathic Hosp.*, 534 A.2d 1282, 1285 (Me.1987); *Bass v. Nooney Co.*, 646 S.W.2d 765, 771–73 (Mo.1983) (en banc); *Versland v. Caron Transp.*, 206 Mont. 313, 671 P.2d 583, 587 (1983); *James v. Lieb*, 221 Neb. 47, 375 N.W.2d 109, 114 (1985); *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 395 S.E.2d 85, 97 (1990); *Schultz v. Barberton Glass Co.*, 4 Ohio St.3d 131, 447 N.E.2d 109, 112–13 (1983); *see generally*, Comment, *Is the Injury Requirement Obsolete in a Claim for Fear of Future Consequences?*, 41 U.C.L.A. L.Rev. 1337, 1356 (1994); Scott D. Marrs, *Mind Over Body: Trends Regarding the Physical Injury Requirement*, 28 Tort & Ins. L.J. 1, 39 (1992).

In *Molien*, the Supreme Court of California addressed a husband's claim for emotional distress arising from the allegedly negligent misdiagnosis of his wife's illness as syphilis. 616 P.2d at 814. The husband claimed that tension and hostility arose between himself and his wife as a result of the misdiagnosis, which led to a dissolution of

their marriage. *Id.,* 167 Cal.Rptr. at 833, 616 P.2d at 815.

Holding that the husband was entitled to recover damages for the emotional distress he suffered as a result of the misdiagnosis, the *Molien* court observed that "emotional injury may be fully as severe and debilitating as physical harm, and is no less deserving of redress; the refusal to recognize a cause of action for negligently inflicted injury in the absence of some physical consequence is therefore an anachronism." *Id.* at 832, 616 P.2d at 814. In allowing the action to go forward, the court focused on the foreseeability of the husband's emotional distress. *Id.* at 834–36, 616 P.2d at 816–17. The court stated that "the risk of harm to plaintiff was reasonably foreseeable to defendants. It is easily predictable that an erroneous diagnosis of syphilis ... would produce marital discord and resultant emotional distress to a married patient's spouse." *Id.* at 835, 616 P.2d at 817. In support of this conclusion, the court further noted that the defendant doctor told the wife to inform her husband of the diagnosis and to have her husband tested for the disease. *Id.* at 832, 835, 616 P.2d at 814, 817.

We do not believe that the traditional tort principle of foreseeability, standing alone, properly defines the scope of a defendant's duty in an action for damages for negligently inflicted emotional distress. *See Hancock,* 808 P.2d at 258.[5] Rather we believe that a plaintiff's right to recover emotional damages caused by mere negligence should be limited to those cases where the defendant owes the plaintiff a preexisting duty. In *Hancock,* we recognized that a plaintiff may recover emotional distress damages in certain cases where a contractual relationship exists between the parties. *Id.* at 258. In holding that the contract at issue in *Hancock* did not imply such a duty, we observed:

In our view, breach of a house construction contract is not especially likely to result in serious emotional disturbance. Such contracts are not so highly personal and laden with emotion as contracts where emotional damages have typically been allowed to stand on their own. Examples of the latter include contracts to marry, to conduct a funeral, to sell a sealed casket, to conduct a cesarean birth, to surgically rebuild a nose, to provide promised maternity coverage, *to provide medical services,* and to keep a daughter informed of her mother's health.

*Id.* at 258–59 (footnotes omitted) (emphasis added). Under *Hancock,* whenever a defendant stands in a contractual or fiduciary relationship with the plaintiff and the nature of this relationship imposes on the defendant a duty to refrain from conduct that would foreseeably result in emotional harm to the plaintiff, the plaintiff need not establish a physical injury in order to recover for the negligent infliction of emotional distress.

A growing number of jurisdictions have adopted this approach. *See, e.g., Boyles v. Kerr,* 855 S.W.2d 593, 597 (Tex.1993) (holding that therapist-patient relationship gives rise to duty to refrain from activity which carries unreasonable and foreseeable risk of causing emotional or mental harm); *Corgan,* 574 N.E.2d at 606–07 (same); *Oswald v. Le-Grand,* 453 N.W.2d 634, 639 (Iowa 1990) (holding that an exception to physical injury requirement exists where the nature of the relationship between the parties is such that there arises a duty to exercise ordinary care to avoid causing emotional harm); *see also Ruark Obstetrics,* 395 S.E.2d at 93–94 (noting that a contractual relationship between the parties may serve to make "the plaintiffs' emotional distress all the more the proximate and foreseeable result of the defendant's negligence"); *see generally* David Crump, *Evaluating Independent Torts Based Upon*

---

5. In *Hancock* we noted that permitting a plaintiff to recover for the negligent infliction of emotional distress in the absence of physical injury would effectively do away with the tort of intentional infliction of emotional distress:

[T]he recovery of emotional distress damages unaccompanied by physical injuries [is limited] to cases (1) where the emotional distress is "severe," (2) where the conduct of the tortfeasor is intentional or reckless, and (3) where such conduct is capable of being characterized as extreme or outrageous. The last two limitations would be meaningless if negligent infliction of emotional distress without physical injury was legally redressable.

808 P.2d at 258 (citations omitted).

*"Intentional" or "Negligent" Infliction of Emotional Distress: How Can We Keep the Baby from Dissolving in the Bath Water?*, 42 Def.L.J. 583, 612–32 (1992).

The California Supreme Court itself has retreated from the broad foreseeability approach enunciated in *Molien*. *See Burgess v. Superior Court*, 2 Cal.4th 1064, 9 Cal.Rptr.2d 615, 619, 831 P.2d 1197, 1201 (1992). The *Burgess* court observed:

> The broad language of the *Molien* decision coupled with its perceived failure to establish criteria for characterizing a plaintiff as a "direct victim" rather than a "bystander" has subjected *Molien* to criticism from various sources, including this court. The great weight of this criticism has centered upon the perception that *Molien* introduced a new method for determining the existence of a duty, limited only by the concept of foreseeability. To the extent that *Molien* ... stands for this proposition, it should not be relied upon and its discussion of duty is limited to its facts. As [we have previously] recognized, "[I]t is clear that foreseeability of the injury alone is not a useful 'guideline' or a meaningful restriction on the scope of [an action for damages for negligently inflicted emotional distress." *Thing v. La Chusa*, 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814 (1989).]
>
> Nevertheless, other principles derived from *Molien* ... are sound: (1) damages for negligently inflicted emotional distress may be recovered in the absence of physical injury or impact, and (2) a cause of action to recover damages for negligently inflicted emotional distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases where a duty arising from a preexisting relationship is negligently breached.

*Id.; see also Marlene F. v. Psychiatric Med. Clinic*, 48 Cal.3d 583, 257 Cal.Rptr. 98, 102–03, 770 P.2d 278, 282 (1989) (holding that a plaintiff may recover for emotional distress without physical injury where the defendant breaches a duty "assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two"). The *Burgess* court went on to hold that a mother could recover for the emotional distress she suffered as a result of the negligent injury to her child during labor and delivery:

> Under the facts of this case, [the mother] is not a "bystander" for purposes of bringing a claim for compensation for damages for her serious emotional distress. [The mother] is permitted to recover these damages as a result of the breach of the duty of care arising from the physician-patient relationship....

9 Cal.Rptr.2d at 622, 831 P.2d at 1204.

Our holding today does not modify the requirements for "bystander" recovery we applied in *Mattingly*. *See* 743 P.2d at 365–66; *supra* note 4. As the *Burgess* court observed, bystander cases "all arise in the context of physical injury or emotional distress caused by the negligent conduct of a defendant *with whom the plaintiff had no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that owed to the public in general.*" 9 Cal.Rptr.2d at 618, 831 P.2d at 1200 (quoting *Christensen v. Superior Court*, 54 Cal.3d 868, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991)). Our holding also leaves intact the tort of intentional infliction of emotional distress which provides a remedy to a victim of intentional and outrageous conduct by a defendant who owes the victim no preexisting duty of care. *See Hancock*, 808 P.2d at 258.

We emphasize that a plaintiff may recover for only "severe" or "serious" emotional distress under any of the above theories. There are compelling reasons for limiting the recovery of the plaintiff to claims of *serious* mental distress. *See Rodrigues*, 472 P.2d at 520. "[S]erious mental distress may be found where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Id.; see also Molien*, 167 Cal.Rptr. at 837–38, 616 P.2d at 819–20. Examples of serious emotional distress may include "neuroses, psychoses, chronic depression, phobia, and shock." *Lejeune*, 556 So.2d at 570. However, temporary fright, disappointment or regret does not suffice under

this standard. *Ruark Obstetrics,* 395 S.E.2d at 97.

■ Whether a plaintiff's alleged emotional distress satisfies this standard presents a question for the jury. While some jurisdictions have required claims of emotional distress to be "medically diagnosable or objectifiable," [6] we do not believe that such a limitation is necessary or desirable.

> [J]urors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience. In addition, there will doubtless be circumstances in which the alleged emotional injury is susceptible of objective ascertainment by expert medical testimony. To repeat: this is a matter of proof to be presented to the trier of fact. The screening of claims on this basis at the pleading stage is a usurpation of the jury's function.

*Molien,* 167 Cal.Rptr. at 839–40, 616 P.2d at 821. *See also Corgan,* 158 Ill.Dec. at 496, 574 N.E.2d at 609 ("this court has not lost its faith in the ability of jurors to fairly determine what is, and is not, emotional distress"). In some cases, the circumstances surrounding a claim may be sufficient to persuade a jury that the plaintiff has actually suffered serious emotional trauma.[7]

Based on the above analysis, we reverse the superior court's grant of a directed verdict against Savitri on the issue of negligent infliction of emotional distress. As Savitri's treating physician, Dr. Mackie owed her a duty to refrain from activity which presented a foreseeable and unreasonable risk of causing emotional distress. *See Burgess,* 9 Cal. Rptr.2d at 622, 831 P.2d at 1204. A jury could reasonably conclude that the emotional

distress resulting from a misdiagnosis of AIDS is foreseeable and that such distress is serious or severe. *See Molien,* 167 Cal.Rptr. at 839–40, 616 P.2d at 821; *Lejeune,* 556 So.2d at 571. Also, Savitri presented medical testimony that she suffered from post-traumatic stress disorder.

The significance of a false imputation of AIDS is unquestionable. In *M.M.H. v. United States,* 966 F.2d 285, 291 (7th Cir.1992), the court recognized the magnitude of an AIDS diagnosis. After noting the well-established exception to the physical injury requirement in cases where the defendant misinformed the plaintiff that a loved one was dead, the court stated: "The plaintiff cleverly argues that if informing someone that a loved one has died forms an exception to the requirement, then informing someone that they themselves are going to die should also. This argument has force." [8] *Id.; see also Marriott v. Sedco Forex Intern. Resources,* 827 F.Supp. 59, 75 (D.Mass.1993) (noting that courts have allowed "AIDS phobia" claims in the absence of physical manifestations where anxiety arises from incident which "substantiates the genuineness of the plaintiff's fear").

In the present case, Savitri is entitled to an opportunity to present her case to a jury. We therefore reverse the trial court's holding and remand Savitri's negligent infliction of emotional distress claim.

### 2. *Amount of recovery: window of anxiety*

■ In her briefing before this court, Savitri essentially recognizes that she is entitled to emotional damages resulting from her belief that she had AIDS only for that period in which this belief was reasonable.

> the plaintiff and hence *serve as a measure of the validity of plaintiff's claim for emotional distress. As yet another corroborating factor, we note the universally accepted gravity of a false imputation of syphilis: by statute it constitutes slander per se.*
> 167 Cal.Rptr. at 837, 839, 616 P.2d at 819, 821 (emphasis added); *see also* Keeton § 54, at 362.

---

6. *See, e.g., Bass,* 646 S.W.2d at 772–73; *Ruark,* 395 S.E.2d at 97; *cf. Faya v. Almaraz,* 329 Md. 435, 620 A.2d 327, 338 (1993) (defining physical injury to include "objectively measurable" mental distress).

7. Several courts allow recovery for mental distress where there are circumstantial indicia or guarantees of genuineness. For example, in *Molien,* the court observed:

> The negligent examination of Ms. Molien and the conduct flowing therefrom are objectively verifiable actions by the defendants that foreseeably elicited serious emotional responses in

8. The court did not reach the validity of this argument because it decided that the plaintiff had established a physical injury. *M.M.H.,* 966 F.2d at 291.

In the context of allegedly negligent exposure to the HIV virus, several courts have held that a plaintiff may only recover emotional distress damages during a defined period of "reasonable anxiety." *See, e.g., Kerins v. Hartley*, —— Cal.App.4th ——, 21 Cal.Rptr.2d 621, 632 (Cal.App.1993). In *Kerins*, a patient sued a surgeon, seeking compensation for the emotional distress she had suffered upon discovering that the surgeon infected with the AIDS virus had performed an operation on her. After declining to limit a plaintiff's right to recover emotional damages to cases where the plaintiff alleges and proves actual exposure,[9] the court stated that the reasonable window of anxiety, for which recovery was proper, closes "after the plaintiff has had sufficient opportunity to determine with reasonable medical certainty that he or she has not been exposed to or infected with the AIDS virus." 21 Cal.Rptr.2d 621, 632 (App.1993). The court elaborated that the patient's emotional distress was no longer compensable after

> she received access to the operative report and/or in some other manner received assurances that no actual exposure to [HIV-infected] blood had occurred; she received test results negative for the presence of HIV antibodies; and she had the opportunity to obtain counseling on the accuracy and reliability of the testing methods employed....

*Id.; see also Faya*, 620 A.2d at 337 ("Appellants may only recover for their fear ... for the period constituting their reasonable window of anxiety—the period between which they learned of [the potential exposure] and received their HIV-negative results.").

Although we agree that there is a presumption that a plaintiff's emotional anxiety arising from "AIDS phobia" is no longer reasonable after the plaintiff learns that he or she is not HIV-positive, we do not foreclose the possibility that a plaintiff may be able to establish, through appropriate expert testimony, long-term emotional trauma proximately related to the defendant's negligent conduct.

### 3. *Recovery of emotional damages for invasion of privacy and/or breach of confidentiality*

Before trial, the superior court, Judge Hunt, granted partial summary judgment in favor of Savitri on the issues of whether Dr. Mackie owed a duty of confidentiality to Savitri and whether he breached that duty by informing Matthew of the ELISA screen test results without her authorization. However, Judge Hunt found that reasonable minds could differ on the issue of whether Dr. Mackie's breach was justified. At trial, Judge Johnstone granted directed verdicts in favor of Dr. Mackie on all issues, including the breach of confidentiality issue.

■ On appeal, Savitri argues that Dr. Mackie's act of informing her husband of the test result without her authorization supports an award of damages for emotional distress. Initially, she notes that the right to privacy is specifically enumerated in the Alaska Constitution. However, in *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1130 (Alaska 1989), we held that the constitutional right to privacy is a right against government action, not against the actions of private parties. Thus, to the extent her argument is based on the Alaska Constitution, her claim must fail.

■ Savitri also fails to present a persuasive argument under common law invasion of privacy principles. There are four branches of the common law right to privacy, as recognized in the Restatement (Second) of Torts §§ 652A–E, at 376 (1977). *See Luedtke*, 768 P.2d at 1137 & n. 15 (citing Restatement). None of these sections can be read to support Savitri's claim in the present case.

> This argument is unpersuasive. Unlike the cases cited above, in which the plaintiff was exposed to a medium potentially carrying the virus (for example, a needle), here Savitri alleges that she was negligently told that she was infected. In such a case, where the fear is directly caused by the negligence and is in no sense speculative, recovery for emotional distress is proper.

9. Dr. Mackie notes that many cases involving anxiety or fear of AIDS have held that actual exposure to the HIV virus is required to support recovery. *See, e.g., Burk v. Sage Prods., Inc.*, 747 F.Supp. 285, 287 (E.D.Pa.1990). *But see, e.g., Faya*, 620 A.2d at 336–37. Since Savitri was never actually exposed to the virus, Mackie argues that she cannot recover under this line of cases.

Finally, she maintains that Dr. Mackie's breach of his duty of confidentiality directly supports an award of purely emotional damages. She argues that "[i]t will be a rare case where physical injury results from the breach of the confidential relationship."

Courts have recognized that a physician's breach of the duty of confidentiality permits the recovery of emotional damages.[10] For example, in *MacDonald v. Clinger*, 84 A.D.2d 482, 446 N.Y.S.2d 801, 802 (1982), a New York appellate court addressed a claim for emotional distress against a psychiatrist who revealed confidential information to the plaintiff's spouse. The court stated that "for so palpable a wrong, the law provides a remedy." *Id.*, 446 N.Y.S.2d at 803 (quoting *Smith v. Driscoll*, 94 Wash. 441, 162 P. 572 (1917)). The court noted that other jurisdictions had recognized "a legally compensable injury in such wrongful disclosure [cases] based on a variety of grounds for recovery: public policy; right to privacy; breach of contract; breach of fiduciary duty." *Id.* at 802.

After concluding that a privacy action could not be maintained, *id.* at 803, the court held that a physician's disclosure of confidential information constituted "a violation of a fiduciary responsibility to plaintiff implicit in and essential to the doctor-patient relation." *Id.* at 805. The court further held that the breach of such duty is actionable as a tort, enabling the plaintiff to recover for "mental distress . . . and the deterioration of his marriage." *Id.* at 804. In reaching this conclusion, the court reasoned that "the confidentiality of the relationship is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *Id.* at 802. *See also Horne v. Patton*, 291 Ala. 701, 287 So.2d 824 (1974) (allowing privacy, fiduciary, and contract causes of action to proceed against physician for disclosure of confidential information); *cf. Doe v. Roe*, 190 A.D.2d 463, 599 N.Y.S.2d 350 (1993) (allowing cause of action

against physician for release of HIV information in violation of AIDS confidentiality statute); *Urbaniak v. Newton*, 226 Cal.App.3d 1128, 277 Cal.Rptr. 354 (1991) (allowing privacy cause of action under California Constitution against physician for unauthorized disclosure of HIV diagnosis).

Savitri argues that the need for confidentiality is increased in cases involving AIDS. Indeed, other courts have recognized the heightened need for confidentiality in the AIDS context. For example, in holding that unauthorized disclosure of an HIV diagnosis was actionable under the California Constitution, the *Urbaniak* court stated that "[t]he condition is ordinarily associated either with sexual preference or intravenous drug uses. It ought not to be, but quite commonly is, viewed with mistrust or opprobrium. . . . [I]t is clearly a 'private fact' of which the disclosure may 'be offensive and objectionable to a reasonable [person] of ordinary sensibilities.'" *Urbaniak*, 277 Cal.Rptr. at 360 (quotation omitted). *See also Rasmussen v. South Fla. Blood Servs.*, 500 So.2d 533, 537 (Fla.1987) (public response to AIDS makes unauthorized disclosure of AIDS a "more critical matter"; by its very nature such disclosure constitutes "disclosure in a damaging context"); *Doe*, 599 N.Y.S.2d at 353 (discussing legislative basis for AIDS confidentiality statute).

We find *MacDonald*'s recognition of a cause of action for emotional distress arising from a physician's breach of the duty of confidentiality to be persuasive. However, *MacDonald* also observed that "the disclosure of medical information to a spouse may be justified under some circumstances." 446 N.Y.S.2d at 805. The court went on to explain:

> Disclosure of confidential information . . . to a spouse will be justified whenever there is a danger to the patient, the spouse, or another person; otherwise information should not be disclosed without authorization. Justification or excuse will depend upon a showing of circumstances

---

**10.** *See Horne v. Patton*, 291 Ala. 701, 287 So.2d 824, 830 (1974). In *Horne*, the Alabama court noted that states which have enacted a doctor-patient testimonial privilege have been virtually uniform in allowing a cause of action for unauthorized disclosure. Alaska has recognized the doctor-patient testimonial privilege. *See* Alaska R.Evid. 504.

and competing interests which support the need to disclose. Because such showing is a matter of affirmative defense, defendant is not entitled to dismissal of the action.

*Id.; see also Marlene F. v. Psychiatric Medical Clinic,* 48 Cal.3d 583, 257 Cal.Rptr. 98, 102 n. 5, 770 P.2d 278, 282 n. 5 (1989) (citing cases holding that a doctor, having diagnosed an illness, may be liable for failure to warn patient's family members); *cf.* Restatement (Second) of Torts §§ 595, 652G (recognizing privilege to disclose, in context of privacy tort, for "protection of interest of recipient").

Courts have repeatedly held that physicians must use reasonable care to protect third persons from foreseeable exposure to contagious diseases. *See, e.g., Gammill v. United States,* 727 F.2d 950, 954 (10th Cir. 1984) (holding that in contagious disease cases, "physician may be found liable for failing to warn a patient's family, treating attendants, or other persons likely to be exposed to the patient of the ... danger of exposure"); *Wojcik v. Aluminum Co. of America,* 18 Misc.2d 740, 183 N.Y.S.2d 351, 357–58 (N.Y.1959) (holding that a physician had a duty to warn the spouse of a patient diagnosed with tuberculosis where there was a foreseeable risk that the spouse would be exposed to the disease); *cf. Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal. Rptr. 70, 75, 614 P.2d 728, 733 (1980) (stating that where a therapist knows or should know that a patient poses an imminent and foreseeable threat to an identifiable victim, the therapist must warn the victim or take other reasonable steps to protect the victim) (citing *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976)). In light of this authority, we hold that when a physician diagnoses a patient with a fatal, sexually transmitted disease such as AIDS, the physician's disclosure of this diagnosis to the patient's spouse is privileged as a matter of law.[11] We there-

fore affirm the superior court's directed verdict on this issue.

C. *Intentional Infliction of Emotional Distress*

This court has applied the approach set forth in the Restatement (Second) of Torts to intentional infliction of emotional distress (IIED) claims. *Tommy's Elbow Room v. Kavorkian,* 727 P.2d 1038, 1043 (Alaska 1986). Under the Restatement, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress...." *Croft v. Wicker,* 737 P.2d 789, 792 (Alaska 1987) (quoting Restatement (Second) of Torts § 46(1) (1965)). The elements necessary to support a prima facie cause of action for IIED were set forth in *Teamsters Local 959 v. Wells,* 749 P.2d 349, 357 (Alaska 1988): "(1) the conduct is extreme and outrageous, (2) the conduct is intentional or reckless, (3) the conduct causes emotional distress, and (4) the distress is severe." *See also Cameron v. Beard,* 864 P.2d 538, 548 (Alaska 1993). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Oaksmith v. Brusich,* 774 P.2d 191, 200 (Alaska 1989) (quoting Restatement (Second) of Torts § 46 cmt. d (1964)).

If reasonable jurors could differ as to whether the evidence adduced at trial would satisfy these elements, the superior court is required to submit the IIED claim to the jury. *Teamsters,* 749 P.2d at 357–58. However, as a threshold matter, the court must determine "whether the severity of the emotional distress and the conduct of the offending party warrant an instruction on intentional infliction of emotional distress." *Id.* at 357; *Richardson v. Fairbanks N. Star*

11. This rule is consistent with a number of legislative proposals concerning a physician's liability for unauthorized disclosure of confidential information in AIDS cases. *But see Diaz Reyes v. United States,* 770 F.Supp. 58, 63 (D.P.R.1991) (suggesting that Puerto Rican law does not allow a doctor to report AIDS diagnosis to spouse without authorization). *See generally* Comment, *The Physician's Duty to Warn Non-Patients: AIDS Enters the Equation,* 5 Cooley L.Rev. 353 (1988) (recommending imposing a duty to warn where the physician knows the identity of the sexual or needle-sharing partners of the patient).

*Borough,* 705 P.2d 454, 456 (Alaska 1985). This threshold determination will not be overturned on appeal absent an abuse of discretion. *Cameron,* 864 P.2d at 548; *Richardson,* 705 P.2d at 456.

■ At trial, the superior court granted a directed verdict to Dr. Mackie on Savitri's IIED claim. The court concluded that "[r]easonable minds could not differ on the issue of whether or not the conduct complained of here was of such an outrageous nature that malice could be inferred, that an evil intent could be inferred to Dr. Mackie, that he had any ulterior motive, anything to gain."

On appeal, Savitri maintains that this conclusion was erroneous. According to Savitri, Dr. Mackie recklessly and outrageously diagnosed her as having the AIDS virus based solely on an unconfirmed screening test. She also argues that Dr. Mackie's failure to acquire her consent to the HIV test and his alleged breach of the duty of confidentiality bolster her IIED claim. We disagree.

Taking the record in the light most favorable to Savitri, Dr. Mackie's conduct cannot be characterized as going "beyond all possible bounds of decency." *See Oaksmith v. Brusich,* 774 P.2d at 200. Dr. Mackie told Savitri and her husband that Savitri had tested positive for AIDS, that retesting should be done, and that he had called in a specialist. Although Dr. Mackie could have emphasized that the positive test result did not prove anything and that further testing was necessary before any interpretation of Savitri's HIV antibody status was possible, his failure to do so cannot reasonably be characterized as outrageous. The evidence presented at trial indicated that Dr. Mackie's actions conformed to applicable professional standards. Furthermore, we have already determined that Dr. Mackie's disclosure to Matthew of Savitri's test results was privileged as a matter of law. We therefore conclude that Dr. Mackie's actions do not satisfy the first element necessary to sustain an IIED claim, extreme and outrageous conduct.

Dr. Mackie's actions likewise do not satisfy the second element required for an IIED cause of action, intentional or reckless conduct.[12] In *Tommy's Elbow Room,* we explained that "[i]n cases where the plaintiff alleges that the defendant acted recklessly, it must be shown that the defendant acted in deliberate disregard of a high degree of probability that the emotional distress will follow." 727 P.2d at 1044. We then found that, while it was foreseeable that an intoxicated patron would drive, have an accident, and cause emotional distress, such facts were not reasonably regarded as "highly probable." *Id.*

In the present case, it cannot be said that conducting a blood test on a hospitalized patient and informing the patient's husband of the results of that test create a high probability of causing severe emotional distress. Thus, Dr. Mackie's actions also fail to satisfy the second element of an IIED claim.

Based on this analysis, we affirm the superior court's grant of a directed verdict to Dr. Mackie on Savitri's IIED claim. The court did not abuse its discretion in concluding that, as a matter of law, no reasonable juror could find Dr. Mackie's actions to be extreme, outrageous or reckless. *See Urbaniak,* 277 Cal.Rptr. at 362 (doctor's breach of duty of confidentiality in revealing patient's HIV status was not "outrageous" as a matter of law).

### D. *Punitive Damages*

Punitive damages serve two purposes: "to punish the wrongdoer and to deter the wrongdoer and others like him from repeating the offensive act." *State Farm Mut. Auto. Ins. Co. v. Weiford,* 831 P.2d 1264, 1266 (Alaska 1992) (citation omitted). The availability of such damages "turn[s] on the wrongdoer's motive, state of mind, and degree of culpability." *Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767, 774 (Alaska 1982).

---

12. Savitri does not, and could not, assert that Mackie's conduct was intentional for IIED purposes. *See Teamsters,* 749 P.2d at 357 n. 13 ("An actor intends to inflict emotional distress if he desired to inflict severe emotional distress, or where he knew that such distress was certain or substantially certain to result from his conduct.").

This court has held that punitive damages are a harsh remedy "not favored in law. They are to be allowed only with caution and within narrow limits." *State Farm*, 831 P.2d at 1266; *Alyeska Pipeline Serv. Co. v. Beadles*, 731 P.2d 572, 574 (Alaska 1987). This hesitance to award punitive damages is reflected in AS 09.17.020, which provides that "[p]unitive damages may not be awarded in an action ... unless supported by clear and convincing evidence." *See Lee Houston & Assocs. v. Racine*, 806 P.2d 848, 856 (Alaska 1991).

To support a claim for punitive damages, "the plaintiff must prove by clear and convincing evidence that the defendant's conduct was outrageous, such as acts done with malice, bad motive, or reckless indifference to the interests of another." *Lee Houston*, 806 P.2d at 856. Although a showing of actual malice is not required, *Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 46 (Alaska 1979), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981), *overruled on other grounds, Dura Corp. v. Harned*, 703 P.2d 396 (Alaska 1985)), the plaintiff must establish, at a minimum, that the defendant's conduct "amounted to reckless indifference to the rights of others, and conscious action in deliberate disregard of [those rights]." *State v. Haley*, 687 P.2d 305, 320 (Alaska 1984) (quoting *Sturm*, 594 P.2d at 47); *see also State Farm*, 831 P.2d at 1266 ("Malice may be inferred if the acts exhibit 'a callous disregard for the rights of others.'") (quoting *O'Kelley*, 645 P.2d at 774); *Hayes v. Xerox Corp.*, 718 P.2d 929, 934–35 (Alaska 1986) ("Conscious action in 'deliberate disregard of [others] ... may provide the necessary state of mind to justify punitive damages.'") (citation omitted).

In *Hayes*, we adopted the definition of "reckless disregard" set forth in the comments to Restatement (Second) of Torts § 500.

> We are persuaded by the comments to the Restatement (Second) of Torts § 500, which define reckless disregard of safety.
>
> Conduct cannot be in reckless disregard of the safety of others unless the act or omission is itself intended, notwithstanding that the actor knows of facts which would lead any reasonable man to realize the extreme risk to which it subjects the safety of others. It is reckless for a driver of an automobile *intentionally* to cross a through highway in defiance of a stop sign if a stream of vehicles *is seen* to be closely approaching in both directions, but if his failure to stop is due to the fact that he has *permitted his attention to be diverted so that he does not know that he is approaching the crossing, he may be merely negligent and not reckless.*
>
> Restatement (Second) of Torts § 500 comment (b) (1964) (emphasis added).
>
> Reckless misconduct differs from negligence which consists of mere "inadvertence, incompetence, unskillfulness" because reckless misconduct requires a conscious choice of a course of action. *Id.* comment (g).

*Hayes*, 718 P.2d at 935 (footnote omitted).

It is well-established that "'where there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice,' the trial court need not, and indeed should not, submit the issue of punitive damages to the jury." *State Farm*, 831 P.2d at 1266 (quoting *O'Kelley*, 645 P.2d at 774). This threshold determination will not be overturned absent an abuse of discretion. *Bridges v. Alaska Hous. Auth.*, 375 P.2d 696, 702 (Alaska 1962).

In the present case, the superior court did not err in granting a directed verdict to Dr. Mackie on the issue of punitive damages. As discussed above in the IIED context, Dr. Mackie's conduct simply cannot be characterized as outrageous. *See Haley*, 687 P.2d 305, 320 (Alaska 1984) (where standard of care is not clearly defined, breach does not support recovery of punitive damages). Moreover, Dr. Mackie's actions subsequent to his allegedly wrongful conduct (for example, requesting that a psychiatric nurse be available to counsel Savitri) reflect a concern for his patient's emotional well-being. *See Wien Air Alaska v. Bubbel*, 723 P.2d 627, 631 (Alaska 1986) (no reasonable juror could conclude defendant was indiffer-

ent to consequences of action where defendant attempted to remedy effects of allegedly wrongful act).

Based on this analysis, we affirm the superior court's grant of a directed verdict in favor of Dr. Mackie on the question of punitive damages.

### E. *Recovery of Economic Loss Resulting from Divorce*

■ The superior court also granted a directed verdict in favor of Dr. Mackie on the issue of whether economic loss resulting from divorce is recoverable as a matter of law. The court concluded:

> [T]here are sufficient public policy reasons to prevent a jury from hearing argument on economic loss as a result of a divorce. That there is [sic] also sound legal reasons on the basis that they're not foreseeable, ... that the economic losses are so intertwined with causation that it presents a jury, a fact finder, with an impossible question in determining the causes and the foreseeability of the economic losses in a marriage.

Savitri appeals from this determination.[13] We affirm the court's holding.

In arguing that economic loss resulting from divorce should be recoverable, Savitri first notes the general rule that a plaintiff is allowed to recover for all injuries proximately caused by a defendant's negligence. *See Poor v. Moore,* 791 P.2d 1005, 1008 (Alaska 1990). She then argues that where injury to the marital relationship is foreseeable, damages, including economic loss, should be recoverable. She concludes that, since it is foreseeable that informing Matthew of her initial test result would create marital discord, her losses should be recoverable.

We have previously noted that an issue may be removed from the jury's consideration where the court as a matter of law determines that the consequences alleged are not reasonably foreseeable or that the plaintiff has failed to sufficiently establish causation. *See Sharp v. Fairbanks N. Star Borough,* 569 P.2d 178, 182–84 (Alaska 1977). In the particular context of recovery for purely economic loss, this court has stated that a plaintiff must establish that "the defendant[ ] knew or reasonably should have foreseen both that particular plaintiffs or an identifiable class of plaintiffs were at risk and that ascertainable economic damages would ensue from the conduct." *Mattingly v. Sheldon Jackson College,* 743 P.2d 356, 360 (Alaska 1987). The court also has power to limit claims, notwithstanding foreseeability, for public policy reasons. *See Poor,* 791 P.2d at 1007–08 (refusing, on policy grounds, to allow action by one parent against another for wrongful birth).

As Dr. Mackie argues in his brief, divorce is never the direct result of actions by a third-party tortfeasor. It is the character of the spouses, and the character of the marriage itself, which determines whether a divorce will occur. Clearly, a variety of outcomes may result from a diagnosis of AIDS, ranging from bringing the married couple closer together to driving them apart. To hold a third-party responsible for economic losses resulting from a divorce in such a case would extend potential liability too far.

This conclusion is in accord with the case law from other jurisdictions addressing "wrongful divorce" actions. Such actions have, with virtual uniformity, been rejected by courts, both on proximate cause/foreseeability grounds and on more general public policy grounds. We find the reasoning in *Prill v. Hampton,* 154 Wis.2d 667, 453 N.W.2d 909, 914–15 (App.1990), persuasive. In *Prill,* the court refused to allow the plaintiff to recover on her claim that her divorce was the result of the injuries sustained by her husband at the hands of the defendant. The court reasoned:

> [Appellant] next contends that ... she is entitled to damages for "wrongful divorce."

---

**13.** The children also take issue with this ruling, arguing that they should be able to recover for monetary losses resulting from the divorce. In particular, they allege that, as a result of their parents' divorce, they lost their previous permanent fund dividend payments, which up until the divorce had been set aside for future educational needs and placed in accounts in their own name. In addition, they also assert a need for continued psychological counseling stemming from the incidents involved in the case.

This type of claim has not been recognized in the past and we refuse to recognize it now. . . . While we recognize that there is a strong public policy that permits injured parties to recover damages for their injuries, we also recognize countervailing public policy considerations that should bar claims for wrongful divorce.

Failure of a marriage is rarely attributable to a single cause. In some instances, there may be evidence that the spouse's injuries were, in part, the cause of the marriage's failure. For the jury to properly assess the amount of damages, however, it is necessary to show both a causal relationship and the extent or degree this factor played in the failure of the marriage. Such an inquiry would open to scrutiny very personal issues, not only of the spouse claiming damages, but also of the injured spouse. This factor, along with the difficulty of the jury in determining the extent to which any single cause may have contributed to the failure of the marriage, requires that such claims be rejected.[14]

*Id.* 453 N.W.2d at 914–15. *See also Bemis Co. v. Rubush,* 401 N.E.2d 48, 64 (Ind.App. 1980) (refusing to judicially recognize a cause of action for wrongful divorce), *vacated on other grounds,* 427 N.E.2d 1058 (Ind.1981); *Koestler v. Pollard,* 162 Wis.2d 797, 471 N.W.2d 7, 10 (1991) (adopting reasoning of *Prill* ); *Koestler,* 471 N.W.2d at 15 (Abrahamson, J., dissenting) ("The tort concept of causation is too simplistic when the interest protected is the marital relationship. . . . Assigning blame and causation for interference with the complex relationship of marriage is extraordinarily difficult, if not impossible.").

For the above reasons, we affirm the superior court's holding that economic losses suffered as a result of a divorce are not recoverable.

### F. *The Children's Claim for Loss of Consortium* [15]

■ The superior court also directed a verdict in favor of Dr. Mackie on the children's claim for loss of consortium. The court stated:

I find that based on the evidence, and giving the weight to the evidence in a light most favorable to [the children], and all the inferences to that evidence, that there is insufficient evidence to go to the jury on whether or not either Mrs. Chizmar or Mr. Chizmar were either emotionally or physically disabled in such a way . . . to prevent them from giving the consortium, that is the care, the love, attention, the educational needs that parents normally give to their children, and nurturing.

The court further explained that "[a]fter viewing the children, after listening to . . . their parents talk about the children, . . . it appears to me that there was no damage[ ] whatsoever to the children from . . . the point of view of consortium loss."

The children appeal this decision, arguing that sufficient evidence was presented to support a loss of consortium claim and that it was "unconscionable on the state of the evidence, after almost three weeks of trial, to take the plaintiff's case away from the jury." On the record presented, we agree that the superior court erred in declining to submit this issue to the jury.

In *Hibpshman v. Prudhoe Bay Supply, Inc.,* 734 P.2d 991 (Alaska 1987), this court

---

**14.** Dr. Mackie also notes that in Alaska, fault is apportioned by percentage in tort actions. AS 09.17.080. In addition, a plaintiff's recovery is reduced to the extent that reasonable steps to mitigate damages were not taken. *Irving v. Bullock,* 549 P.2d 1184, 1187 (Alaska 1976). As Dr. Mackie argues, it is difficult to imagine that a jury will be able to isolate the fault attributable to the third party's actions, from the fault of the two spouses and the weakness inherent in the marriage.

**15.** Loss of consortium is a derivative claim. "In order to recover, the child must prove that the

defendant is liable for the personal injuries suffered by her parent, and any defense that tends to constrict or exclude the defendant's liability to the injured parent will have the same effect on the child's consortium action." *Reagan v. Vaughn,* 804 S.W.2d 463, 467 (Tex.1990)

On appeal, we need only address the children's claim for loss of consortium of their mother, and not their father. Matthew's claim was dismissed at trial and he has not appealed, and the children do not claim that Dr. Mackie has committed a tort against Matthew.

recognized for the first time an action for loss of parental consortium resulting from injuries tortiously inflicted on a parent by third parties. We reasoned that "[w]hen a parent is seriously injured, his or her child suffers a loss of enjoyment, care, guidance, love and protection, and is also deprived of a role model." [16] *Id.* at 994 (citation omitted).

Here, the children rely principally on the following testimony by Dr. Fischer to establish that sufficient evidence was presented for reasonable jurors to differ on the consortium issue:

Q: And lastly, Dr. Fischer, in your opinion, have [the children] ... also in some sense lost their mother?

A: Yes.

Q: And could you tell us in what ways?

A: Mrs. Chizmar is extremely distraught, her anxiety level is so high that it's very difficult for her to concentrate for a long period of time. There's the recurring thoughts of all these events, the loss of her marriage, and I ... just think that she's not the person she once was.

Q: Is she at times, in effect, unable to function, as a mother?

. . . .

A: Oh. Well, I think she's dysfunctional in many ways....

. . . .

Q: In what ways do you feel that she is dysfunctional as a mother?

A: I can give you a comparison with what she was like and what she is now....

Q: Yes.

. . . .

A: Okay. I've seen her household before, and it ... was a showcase. Everything was tidy and immaculate, you could eat off the floors, very organized, a very good manager of the household. Today it's very different. For example, the Christmas decorations were up through February. I tested her at her house because she has no transportation, and there were Easter decorations, I think Easter was March 12th, the Easter de-

corations were still on the dining room table on May 10th. Sometimes they open the couch and watch television and it stays that way for days. It's just not the same household. And of course this affects the family and it affects the children.

Mrs. Chizmar never smoked when I first knew her, and now she smokes continuously. And, so, these things all affect the organization of the family. And as I said, the children have almost become surrogate parents at times, role reversals. And these are not healthy things for children.

In response, Dr. Mackie maintains that this evidence is not sufficient to support a finding that the children were denied "the care, guidance, love and protection that collectively constitute parental consortium." He argues that no testimony was presented to the effect that Savitri "was unable, even temporarily, to care for her daughters and to give them love and nurturing." He further notes that the above-cited testimony fails to distinguish between harm resulting from Dr. Mackie's actions and the effects suffered as a result of "the divorce, their mother's affair with another man, or having a new baby in the family." Thus, he argues that the children failed to establish with sufficient certainty that the damages claimed were caused by the allegedly wrongful conduct at issue. *See Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 154 (Alaska 1992) (causation is the major concern in addressing the speculativeness of a damage claim for directed verdict purposes).

Though this issue presents a close question, we reverse the superior court's directed verdict against the children. On the record presented, reasonable jurors could differ as to whether Dr. Mackie's conduct caused the children to lose the "care, guidance, love and protection" of their mother. *See Hibpshman*, 734 P.2d at 994.

G. *Costs and Fees Assessed Against the Children*

Following trial, the superior court entered final judgment in favor of Dr. Mackie. The

---

16. *Hibpshman* arose in the context of a physical injury to the parent. In their brief, the children argue at length that *Hibpshman*'s recognition of a parental consortium claim should not be limited to the physical injury situation. Dr. Mackie does not take issue with this assertion.

court awarded approximately $2,000 in attorney's fees and $6,800 in costs against the children. Because we reverse the superior court's directed verdict on the children's loss of consortium claims, we vacate the attorney's fee award.

## IV. *CONCLUSION*

We reverse the superior court's holding that physical injury is required to support recovery for negligent infliction of emotional distress. Damages for negligent infliction of emotional distress are recoverable, provided that such damages are foreseeable and severe, and arise from circumstances in which the defendant owes the plaintiff a preexisting duty to refrain from causing distress. In addition, we find that the superior court erred in granting a directed verdict to Dr. Mackie on the children's loss of consortium claims and, accordingly, vacate the attorney's fees award against the children.

We affirm the remainder of the trial court's findings. Although Dr. Mackie breached his duty of confidentiality by disclosing his diagnosis to Matthew without Savitri's consent, this disclosure was justified as a matter of law given the particular facts of this case. Dr. Mackie's conduct also does not rise to the level of outrageousness required to support either an intentional infliction of emotional distress claim or punitive damages. Finally, because economic loss resulting from divorce should not be recoverable, both on causation/foreseeability and policy grounds, we affirm the court's directed verdict on Savitri's claim for economic damages resulting from her divorce.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

EASTAUGH, J., not participating.