**HAGEN INSURANCE, INC.,**
Appellant/Cross–
Appellee,

v.

**Randal ROLLER, d/b/a The Glassman,**
Appellee/Cross–Appellant.

Nos. S–11275, S–11256.

Supreme Court of Alaska.

Jan. 20, 2006.

Gregory G. Silvey, Gary A. Zipkin, and Michelle D. Higuchi, Guess & Rudd P.C., Anchorage, for Appellant/Cross–Appellee.

Thomas L. Melaney, Anchorage, for Appellee/Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

A jury awarded Randal Roller damages against Hagen Insurance, Inc. after finding that Hagen negligently failed to secure workers' compensation insurance for Roller's business, leaving Roller without coverage for an on-the-job injury. Hagen challenges various rulings of the superior court, and Roller cross-appeals. We affirm. Because there was evidence Hagen's negligence caused Roller to suffer a denial of medical treatment, it was not error to submit Roller's emotional distress claim to the jury, whether or not there was evidence Roller's distress was "severe." We also conclude that the superior court did not abuse its discretion in its rulings concerning Roller's expert witness, and that the lack of a permanent impairment rating did not render Roller ineligible for damages replacing future workers' compensation benefits. Finally, because there was no evidence of reckless indifference or malice, the superior court did not err in granting Hagen's motion for directed verdict on Roller's punitive damages claim.

## II. FACTS AND PROCEEDINGS

Randal Roller, d/b/a "The Glassman," worked as a glazier. In October 2000 he and his wife, JoAnne Roller, applied for workers' compensation insurance through Hagen Insurance, Inc. But various problems, including Hagen's alleged negligence in securing the coverage, prevented the coverage from taking timely effect. The Rollers testified at trial that, following a December 1, 2000 meeting with Hagen's Don Simmons and Cynthia Haynes during which the Rollers filled out a new application, they understood the insurance coverage to be effective either immediately or as of the next business day (December 4, a Monday). But according to Hagen, its representative had explained that Hagen did not know when the coverage would become effective because it had to wait for the premium financing to be approved. The actual effective date turned out to be December 12.

On December 7, 2000 Roller hurt his back when he fell from a ladder while at work. JoAnne Roller called Simmons to report the injury before Roller sought medical treatment. Because the policy had not yet taken effect, Simmons informed her there was no coverage. Due to a lack of personal medical insurance, the Rollers were forced to pay for Randal Roller's medical treatment. Randal Roller sued Hagen in December 2001, alleging that Hagen was "negligent in its failure to place Plaintiff's insurance coverage with a qualified underwriter."

Superior Court Judge Sen K. Tan presided over the jury trial of Roller's claims. The superior court granted a directed verdict to Hagen on Roller's punitive damages claim, but submitted Roller's remaining claims to the jury. The jury found for Roller on those claims, determining that Hagen was negligent and that its negligence was a legal cause of injury to Roller. The jury found damages totaling $275,818.18, including $6,250 for past medical expenses, $42,000 for future medical expenses, $2,090 for future entitlements to periodic payments, $31,700 for future entitlement to retraining expenses, $143,778.18 for past non-economic loss, and $50,000 for future non-economic loss. The jury apportioned eighty-eight percent fault to Hagen and twelve percent fault to Roller, for a net verdict of $242,720.

Hagen and Roller both appeal.

## III. DISCUSSION

### A. Standard of Review

■ Decisions to admit expert testimony are reviewed for abuse of discretion.[1]

---

1. *Barrett v. Era Aviation, Inc.,* 996 P.2d 101, 103 (Alaska 2000) (citing *City of Fairbanks v. Nesbett,*

"When reviewing a denial of a motion for either a directed verdict or a judgment notwithstanding the verdict, the court must decide whether the evidence, when examined in the light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment."[2] The standard is the same when we review the granting of a directed verdict.[3] We review questions of law using our independent judgment, "adopting the rule of law most persuasive in light of precedent, reason, and policy."[4]

### B. Emotional Distress Damages

■ Hagen argues that the superior court should not have instructed the jury on the emotional distress claim and should have granted Hagen's motions for a directed verdict or judgment notwithstanding the verdict on the issue because Roller presented insufficient evidence to support an award of emotional distress damages. Hagen also asserts that the superior court erred in allowing Roller to pursue emotional distress damages because Hagen had no timely notice of such a claim and therefore had no opportunity to defend against it.

■ The jury was instructed that Roller was seeking damages for non-economic losses for "emotional distress and physical anxiety." Roller's appellate brief and oral argument refer to the emotional distress claim as one for negligent infliction of emotional distress (NIED).[5] NIED claims differ from typical non-economic damages claims in that

NIED damages may be awarded even if the claimant suffers no physical injury. But NIED damages may only be awarded in certain narrow circumstances and only if the emotional distress is "serious" or "severe."[6] Hagen argues that there was no evidence the distress was severe.

Notwithstanding Roller's characterization of his emotional distress claim as an "NIED" claim, he reasons here, as he did below, that his distress was caused by delays in getting medical treatment and that these delays were attributable to Hagen's negligence. Thus described, his mental distress claim is simply derived from his claim that Hagen prolonged his physical injury. If we conclude that there is evidence that Hagen's negligence caused physical injury to Roller by delaying treatment of his injury, we can affirm the award of emotional distress damages as derivative non-economic damages.[7] If so, we do not need to determine whether the special requirements of an NIED claim were met.

### 1. The jury could have found that Hagen prolonged Roller's physical injury, justifying non-economic damages.

Hagen did not cause Roller's fall from the ladder and the physical injuries directly and immediately resulting from the fall. Roller would have suffered some physical injury regardless of whether he was covered by workers' compensation insurance. Thus, the

---

432 P.2d 607, 611–12 (Alaska 1967)).

2. *Bobich v. Stewart*, 843 P.2d 1232, 1235 (Alaska 1992) (citing *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978)).

3. *Chizmar v. Mackie*, 896 P.2d 196, 200 (Alaska 1995) (upholding directed verdict denying plaintiff's punitive damages claim).

4. *Indus. Commercial Elec., Inc. v. McLees*, 101 P.3d 593, 597 (Alaska 2004).

5. Roller initially submitted a proposed instruction on non-economic losses for "pain and suffering, loss of enjoyment of life, physical impairment and inconvenience resulting from the injury." Roller apparently replaced this proposed instruction with a new instruction filed on the last day of trial requesting non-economic

damages for "emotional distress and physical anxiety." At oral argument before us, Roller could provide no explanation for this substitution.

6. *Kallstrom v. United States*, 43 P.3d 162, 165 (Alaska 2002) (citing *Hancock v. Northcutt*, 808 P.2d 251, 257 (Alaska 1991)); *Chizmar*, 896 P.2d at 204. Alaska only allows NIED claims if the victim is a bystander who directly witnesses physical injury or if the victim is owed a preexisting legal duty by the tortfeasor. *Kallstrom*, 43 P.3d at 165–66 (citing *Chizmar*, 896 P.2d at 203; *Tommy's Elbow Room, Inc. v. Kavorkian*, 727 P.2d 1038, 1043 (Alaska 1986)).

7. Prosser and Keeton describe emotional damages accompanying claims involving physical injury as "parasitic" damages. W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 54 (5th ed.1984). We use the term "derivative" instead.

first question is whether there is evidence that Hagen's negligence prolonged Roller's physical injuries in some way.

The absence of workers' compensation insurance for Roller when he fell from the ladder could have been a legal cause of physical injury in at least two different ways. First, it could have prevented him from receiving medical treatment that would have been covered by workers' compensation insurance and that would have ameliorated physical consequences of his fall. Second, it could have forced Roller to return to work prematurely, delaying or preventing his recovery from the physical injuries caused by the fall.[8]

Roller argues here that he "claimed damages for NIED as a result of the denial of medical treatment for very serious injuries for more than two years, which denial—the jury concluded—was proximately caused by Hagen's negligent failure to promptly place insurance coverage." Roller also argues that "if the workers' compensation coverage had been properly placed, [he] would [have] enjoy[ed] medical coverage for treatment to mitigate the effects of the injury," but "[b]ecause of a lack of financial resources, [he] had been denied treatment of this condition for more than two years at the time of trial." He made the same or similar arguments below, both in opposing Hagen's directed verdict motion and in asking the jury to award emotional distress (or "mental distress") damages.

There was ample evidence that would have permitted the jury to find that the Rollers were financially strapped and that they were personally paying for medical services that would have been covered by workers' compensation insurance. For example, JoAnne Roller testified at length regarding the medical bills she and her husband had paid. The evidence is less clear in establishing that Roller would have seen other physicians or received other treatment had insurance been properly placed. JoAnne Roller's testimony indicates that her husband was able to see four different doctors and underwent "sensory testing," an MRI, X-rays, and physical therapy. This evidence might permit an inference that he was not denied appropriate care.

But there was also evidence that would have justified a contrary inference. Roller was also seen by Dr. John Duddy, who testified by deposition that although spinal decompression surgery was not then necessary, it could become necessary if Roller suffered "a significant flare-up or exacerbation." Dr. Duddy also testified that such a procedure was almost certain to relieve Roller's pain and indicated that it would be Roller's "call" whether or not to have the surgery. Roller's visit to Dr. Duddy was in November 2002; thus, Roller did not learn of this potential course of treatment until nearly two years after his December 7 fall. There was no evidence that lack of insurance delayed Roller from seeing Dr. Duddy. But when asked at trial in May 2003 why he had not undergone the surgery outlined by Dr. Duddy, Roller responded: "[I]t's strictly financial. We've paid about all we can in doctor bills so far, and it's a big chunk to pay for the surgery." Roller also testified that he had "not only considered" whether to have the surgery, but he was "going to have to have it. I can't continue the way it is. Its deteriorating rapidly." Likewise, he testified that "it's gotten to the point where I know I need to do it." JoAnne Roller testified about her research into the likely costs of the surgery outlined by Dr. Duddy but did not testify that her husband was prevented from undergoing the procedure due to lack of insurance. Instead, she testified that "Dr. Duddy told Randy that at some point he was going to have to have some fusion done to his lower back. Because we don't have health insurance, the financial implications are very important, and I needed to know how much money it was going to cost to get Randy's back back in working order."

This testimony implies that the Rollers could not afford to pay for the surgery with-

---

8. The superior court noted this possibility in its September 16, 2003 order denying Hagen's motion for judgment notwithstanding the verdict: "[T]he evidence is clear that the Rollers did not have financial resources to pay for medical treatment *or to allow Roller time to recuperate.*" (Emphasis added.)

out insurance. And, although contrary inferences are certainly possible, we must take all permissible factual inferences in favor of the Rollers on the issue.[9] The testimony consequently permits inferences that Roller would have chosen to undergo before trial the surgery Dr. Duddy proposed, but that the absence of workers' compensation insurance caused him to forgo the surgery. It is not clear from the testimony when Roller first decided that this proposed surgery was necessary. But he saw Dr. Duddy about six months before Roller testified at trial. The jury, considering the testimony of both Rollers, could have found that Hagen's negligence delayed the surgery by some months. This delay therefore prolonged the physical injury Roller suffered when he fell.

There was also evidence that the Rollers' financial condition required Roller to return to work even though he had not recovered.[10] There was evidence that Roller would have been eligible for both monthly disability benefits of about one thousand dollars had the insurance been obtained and retraining benefits that might have allowed him to work in a less stressful occupation. From this the jury could have reasoned that Hagen's negligence contributed to the duration of Roller's physical injury and to the discomfort it caused him.

Because the evidence would have allowed the jury to find that Hagen's negligence caused physical injury to Roller, Roller was eligible for an award of non-economic damages for his emotional distress.

## 2. Hagen failed to preserve the "lack-of-notice" issue.

■ Hagen argues that, because it had no timely notice of the emotional distress claim and therefore no opportunity to defend against it, the superior court erred by permitting Roller to pursue the claim. On May 13, nine days before the court circulated the jury instructions it intended to use, Roller requested a non-economic damages instruction based on a claim of pain and suffering. On the day the court issued its jury instructions, Roller proposed a new non-economic damages instruction that specifically mentioned "emotional distress" and "physical anxiety." It did not refer to pain and suffering. The court's non-economic damages instruction adopted this new proposed instruction.

To the extent Hagen is arguing that it did not receive adequate notice that Roller was pursuing an NIED claim, its argument is mooted by our ruling above that Roller was actually asserting a derivative claim for non-economic damages.

To the extent Hagen is arguing broadly that it did not have adequate notice that Hagen would be seeking non-economic damages, it did not preserve this argument. Although Hagen objected to the court's non-economic damages instruction because it permitted an award of emotional distress damages, Hagen did not explain the ground for its objection. Almost immediately thereafter Hagen's counsel moved for a directed verdict on the claim on the sole ground that "the evidence was insufficient" for an emotional distress claim. Hagen does not argue on appeal that it objected on grounds of lack of notice,[11] and the record does not show that Hagen raised lack of notice as an objection to the emotional distress instruction or to Roller's original ("pain and suffering") proposed non-economic damages instruction.[12] Ha-

---

9. *Getchell v. Lodge*, 65 P.3d 50, 52 (Alaska 2003); *Breitkreutz v. Baker*, 514 P.2d 17, 19 (Alaska 1973).

10. Roller testified that he was "still working to the best I can." He continued: "I'm a sole—sole, you know, provider for the household, and I—I bull through it."

11. Alaska Civil Rule 51(a) provides in part: "No party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its

verdict, stating distinctly the matter to which the party objects and the grounds of the objection."

12. The parties apparently discussed proposed jury instructions with the superior court during an unrecorded session. Our disapproval of off-the-record instructional discussions is long-standing and was recently reiterated in *Reust v. Alaska Petroleum Contractors, Inc.*, 127 P.3d 807, at 814, 2005 WL 2812745 (Alaska, Oct. 28, 2005); *see also City of Nome v. Ailak*, 570 P.2d 162, 166 n. 4 (Alaska 1977); *State v. Abraham*, 566 P.2d 267, 269 (Alaska 1977); *State v. Buckalew*, 561 P.2d 289, 292 (Alaska 1977); *Ervin v.*

gen's directed verdict and JNOV motions did not argue that lack of notice barred an emotional distress award. Hagen therefore did not preserve the lack-of-notice issue for appeal.

Roller did not unequivocally assert at trial that he was seeking non-economic damages stemming from physical injury. And he continues to characterize the non-economic damages award as an NIED award. But he also argued that the claim was justified by the treatment delays. Hagen had sufficient notice of the possibility of derivative non-economic damages to mount an adequate defense. Roller previously proposed a non-economic damages instruction for pain and suffering. Roller's trial brief requested "non-economic damages" to be determined "in view of the seriousness of [Roller's] injuries." Roller's original proposed instruction and trial brief should have alerted Hagen that Roller's non-economic damages claim was not necessarily a true NIED claim. And although Hagen argued at trial that evidence of "serious" or "severe" emotional distress was a prerequisite to an award on the claim, Roller never agreed that his non-economic damages claim depended on whether there was such evidence. Furthermore, although neither Roller's substitute instruction nor the court's instruction required Roller to prove serious or severe emotional distress to recover non-economic damages, Hagen did not object to the instruction on a theory it omitted an element of proof essential to an NIED award. As given, the instruction was consistent with a mental distress claim derivative from a claim for physical injury, and was not consistent with a true NIED claim. Finally, the comments of the superior court imply that it recognized that evidence of serious or severe distress was not necessary if the jury could find that Hagen negligently caused physical injury to Roller by delaying medical

treatment or benefits he would have received if the requested insurance had been in place.

We also note that there is no indication Roller's characterization of the claim put Hagen at a tactical disadvantage. Whether Hagen believed the claim was for NIED or other non-economic damages, it had ample incentive to dispute Roller's claim of mental distress.

### C. Expert Testimony of William Erwin

William Erwin, a lawyer with extensive experience in dealing with Alaska's Workers' Compensation Act,[13] testified as an expert for Roller. Over Hagen's objections, Erwin was permitted to testify about the benefits Roller would have been entitled to, assuming he qualified for them; Erwin was also allowed to express an opinion that Roller would suffer a "permanent partial impairment" if he underwent the surgery described by Dr. Duddy. Hagen challenges Erwin's testimony on several grounds.

#### 1. Allowing Erwin to testify about workers' compensation law in Alaska

■ Before trial Hagen filed a motion in limine to exclude Erwin's testimony; the grounds included a contention that the "proposed testimony would merely instruct the jury on the law, a function reserved for the court." The superior court ruled that Erwin would not be allowed to testify about "what the law is" but would be able to testify about "mixed question[s] of law and fact" such as how benefits are calculated under the law's provisions. The superior court concluded that such testimony would assist the jury in computing damages.

■ Generally, "[e]xpert testimony that states 'an opinion on the current status of the law on a particular subject ... is almost always excluded' because it is not helpful to the jury."[14] However, "some courts will al-

*State*, 761 P.2d 124, 126 n. 2 (Alaska App.1988). Hagen does not contend that it asserted a lack-of-notice objection to the emotional distress damages instruction at the unrecorded instruction session.

**13.** AS 23.30.005 et seq.

**14.** DAVID H. KAYE ET AL., THE NEW WIGMORE: EXPERT EVIDENCE § 1.4, at 18 (2004) (quoting Maury R. Olicker, *The Admissibility of Expert Witness Testimony: Time to Take the Final Leap?*, 42 U. MIAMI L.REV 831, 864 (1988)). *See also* Alaska R. Evid. 702 (providing that expert witness may give opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to

low testimony on certain mixed questions of law and fact," [15] particularly when complex areas of law are involved such as insurance, tax, or patent law.[16] Given the potential complexity of the benefit calculations, we conclude that Erwin's testimony could have provided "appreciable help" to the jury in calculating damages.[17] Moreover, as one court has pointed out, although witnesses "generally should not be permitted to give their opinions on questions of domestic law, this rule does not apply where the legal issue is raised in such a manner that it becomes an operative fact to be proven within the case." [18] The benefits Roller would have received under the workers' compensation law raised a question of fact for the jury because they were relevant to the measure of compensatory damages. We conclude that the superior court did not abuse its discretion in allowing Erwin to testify about how benefits are calculated under the Alaska Workers' Compensation Act.

### 2. Allowing Erwin to apply the law to the facts

■ Hagen also argues that Erwin's testimony inappropriately applied the law to the facts, thereby invading the jury's province. Apart from the permanent impairment issue discussed below, Erwin's testimony concerned the mechanics of benefit calculation under Alaska's workers' compensation regime, had Roller been entitled to them. As discussed above, the jury had not been asked to decide whether Roller should actually receive workers' compensation benefits; rather it was to determine the amount of damages resulting from Hagen's negligence. Erwin's testimony therefore did not infringe on the province of the jury. Instead, it aided the jury by providing a computation of the amount of benefits Roller might have received had Hagen properly placed insurance. Our holding should not be interpreted as encouraging lawyers to become all-purpose experts. But the circumstances of this case made the ruling a permissible discretionary choice.

### 3. Allowing Erwin to express an opinion that the proposed surgery would result in a permanent impairment rating

■ Hagen contends that it was error to allow Erwin to give his opinion that Roller would suffer a permanent impairment if he underwent the surgery described by Dr. Duddy. Hagen contends that "[t]his testimony was improper and misled the jury" because Erwin is not a doctor and was therefore "not qualified to opine about Mr. Roller's 'probable' impairment rating after surgery." Hagen points out that no doctor offered testimony about a potential impairment rating and indeed that "no medical evidence established that Mr. Roller needed future surgery." Therefore, in Hagen's view, Erwin had no basis for his opinion even if he were qualified to give it. We conclude that Erwin was indeed qualified to provide such an opinion and that there was sufficient evidence to support it.

Past decisions support the superior court's ruling. In *Little Susitna Construction Co. v. Soil Processing, Inc.* we held that it was not an abuse of discretion to allow a witness with thirty years of construction experience in Alaska to qualify as an expert witness re-

---

understand the evidence or to determine a fact in issue ...").

15. Kaye, *supra* note 14 at 21.

16. *Id.* at 21–22.

17. *Barios v. Brooks Range Supply, Inc.*, 26 P.3d 1082, 1088 (Alaska 2001) (quoting *Osborne v. Hurst*, 947 P.2d 1356, 1362 (Alaska 1997)) (stating that "the true criterion for determining whether a person qualifies as an expert is 'whether the jury can receive appreciable help from this particular person on this particular subject' ").

18. *Crookham v. Riley*, 584 N.W.2d 258, 267 (Iowa 1998) (citations omitted). This situation arises most frequently in the context of attorney malpractice cases. *See, e.g.*, Kaye, *supra* note 14 at 22 ("[E]xpert testimony on the law may be necessary for juries to render competent decisions in legal malpractice cases."); *Franch v. Ankney*, 341 Md. 350, 670 A.2d 951, 956 (1996) ("Because an expert opinion on the standard of care in an attorney negligence case is often based upon the expert's interpretation of the law, experts in such cases may state their opinion on the law as a foundation for their opinion on the standard of care.").

garding the impact of cold weather on construction equipment, observing that a witness can be qualified as an expert on the basis of experience alone.[19] In *Osborne v. Hurst* we held that it was not an abuse of discretion to allow a real estate broker to express an opinion about the value of a specific parcel of property despite the defendant's argument that the witness had no training as a real estate appraiser.[20] In reaching our conclusion we cited the witness's familiarity with evaluating property.[21]

Erwin, like the experts in *Little Susitna* and *Osborne,* has extensive experience concerning the subject of his contested opinion. He is not a physician and of course cannot issue impairment ratings himself, but there was evidence he has nearly forty years of experience working with clients seeking workers' compensation benefits and he testified that he is very familiar with the guidelines doctors use when issuing ratings.[22] We conclude that this knowledge and experience sufficiently qualified Erwin to predict whether Roller would suffer a permanent impairment if he underwent the surgery. Moreover, the superior court allowed Erwin to express the contested opinion on the condition that it was consistent with Dr. Duddy's testimony and informed Hagen that it could move to strike Erwin's opinion if it were inconsistent. Hagen made no motion to strike.

Hagen's reliance on *Timmons v. Massachusetts Bay Transportation Authority*[23] is not persuasive. The Massachusetts Supreme Judicial Court there ruled that it was improper for a vocational rehabilitation counselor to assume that the plaintiff's injuries would be permanent because such an assumption "was outside the area of the expert's expertise and was not supported by *any* evidence in the record before [the]

court."[24] We concluded above that Erwin was sufficiently qualified to offer the opinion.

We also conclude that there is a more substantial evidentiary basis for an opinion of permanency than there was in *Timmons.* There the only evidence supporting such a conclusion was a chiropractor's statement that the plaintiff "may continue to experience episodes of low back pain . . . for an indefinite period of time."[25] Here Dr. Duddy testified that "[m]ost people who have lumbar surgery to this extent are restricted to light to medium work. . . ." It is reasonable, as Roller contends, to infer from Dr. Duddy's testimony about post-surgery functional limitations that Dr. Duddy expected Roller's condition to be permanent in nature. Erwin was also justified in assuming that Roller would undergo the surgery outlined by Dr. Duddy. Even though Dr. Duddy did not testify that the procedure was currently necessary, he did indicate that the surgery would be performed if Roller chose to undergo it in order to relieve pain and suffering. Roller testified that "it's gotten to the point where I know I need to do [the surgery]."

Accordingly, we conclude that the superior court did not abuse its discretion in allowing Erwin to offer an opinion that Roller would suffer a permanent impairment within the meaning of the applicable guidelines if he underwent the proposed surgery.

**D. Future Workers' Compensation Benefits**

■ Hagen argues that the superior court should not have permitted an award for future workers' compensation benefits because Roller did not demonstrate that he was reasonably likely to "incur those damages in the future." Because Roller did not have a permanent impairment rating, Hagen as-

---

19. *Little Susitna Constr. Co. v. Soil Processing, Inc.,* 944 P.2d 20, 27–28 (Alaska 1997).

20. *Osborne v. Hurst,* 947 P.2d 1356, 1361–62 (Alaska 1997).

21. *Id.* at 1362.

22. AS 23.30.190(b) provides: "All determinations of the existence and degree of permanent impairment shall be made strictly and solely under the whole person determination as set out in

the American Medical Association Guides to the Evaluation of Permanent Impairment. . . ."

23. *Timmons v. Mass. Bay Transp. Auth.,* 412 Mass. 646, 591 N.E.2d 667 (1992).

24. *Id.* at 669 (emphasis added).

25. *Id.* at 671.

serts, the superior court should not have instructed the jury on future workers' compensation benefits. Hagen cites *Rydwell v. Anchorage School District*[26] for the proposition that an impairment rating is a prerequisite to obtaining future benefits.

It is true that to be eligible for benefits under *Rydwell,* a claimant must have a permanent impairment rating exceeding zero once medical stability is reached.[27] Roller does not dispute this point. He instead argues that the evidence demonstrated that he was likely to receive a permanent impairment rating once he reached medical stability by undergoing the surgery outlined by Dr. Duddy. We agree with Roller that requiring him to have actually received a permanent impairment rating would allow Hagen to profit from its own negligence because it is unlikely that the Rollers could afford the surgery without insurance. Roller sought damages to replace the benefits he would have been likely to receive. It was therefore appropriate for the superior court to submit this issue to the jury, because reasonable persons could find that it was more likely than not that Roller would receive a permanent impairment rating once he reached medical stability after surgery.

### E.  Punitive Damages

■■■ In granting Hagen's directed verdict motion on the issue of punitive damages, the superior court ruled that there were no "issues of material fact regarding conduct that would amount to maliciousness, hostility, recklessness, manifest indifference." Roller argues that this ruling was erroneous. First, he contends that Hagen's handling of his October application constituted reckless indifference. Second, he suggests that Hagen changed the effective date on the December

application to support its version of the transaction.

■■■ We have stated that "[t]o recover punitive damages, 'the plaintiff must prove by clear and convincing evidence that the defendant's conduct was outrageous, such as acts done with malice, bad motives, or reckless indifference to the interests of another.' "[28] Further, "[i]f there is no evidence giving rise to an inference of actual malice, or reckless indifference equivalent to actual malice, the trial court need not submit the issue of punitive damages to the jury."[29] The jury found that Hagen was negligent in procuring insurance coverage for Roller. But however incompetent or negligent Hagen's conduct may have been, there is no evidence that Hagen intended to injure Roller or that it knew Roller would be injured as a result of its actions.[30]

Only with respect to the dispute over the original effective date of the December application could Hagen's conduct even arguably have met the "reckless indifference" standard. The application submitted at trial contained a handwritten date of December 12. Roller apparently contends that the date was changed to undermine his case and to support Hagen's contention that the Rollers knew it would be several days before the coverage actually took effect. In Roller's view, this scenario raises the prospect of outrageous conduct.

Don Simmons testified that the application's original effective date was December 10, selected in order to "match up with the premium finance agreement." This agreement was signed by Roller at the December 1 meeting and indicates that the policy's effective date was December 10. December 10 also appeared as the policy's effective date

---

**26.** *Rydwell v. Anchorage Sch. Dist.,* 864 P.2d 526, 531 (Alaska 1993) (upholding superior court's denial of reemployment benefits because claimant "received a rating of zero permanent impairment").

**27.** *Id.* at 529.

**28.** *Robles v. Shoreside Petroleum, Inc.,* 29 P.3d 838, 846 (Alaska 2001) (quoting *Chizmar v. Mackie,* 896 P.2d 196, 210 (Alaska 1995)). *See also* AS 09.17.020(b).

**29.** *Robles,* 29 P.3d at 846 (citing *Alyeska Pipeline Serv. Co. v. O'Kelley,* 645 P.2d 767, 774 (Alaska 1982)).

**30.** *See id.* at 840, 846 (affirming dismissal of punitive damage claim regarding negligent training, safe handling of propane tanks, and failure to warn).

in a "fax-a-quote" sent to the financing company by Simmons immediately before the December 1 meeting.

The Rollers testified that after the December 1 meeting they believed the coverage would be effective the next business day (December 4) but did not provide any specific testimony about the original date set out in the application. They could not recall any discussion about the effective date, nor could they recall seeing the December 10 date on the premium finance agreement. In comparison, Simmons and another Hagen employee, Cynthia Haynes, both testified that the Rollers were informed several times during the December 1 meeting that coverage would not become effective until premium financing was obtained and that it was not known when that would occur.

Roller asserts that Haynes's testimony "corroborate[s]" the Rollers' testimony and that Haynes "testified the effective date upon execution was likely December 1, 2000." This does not accurately describe Haynes's testimony. Haynes actually testified that she could not recall the original date of the December application, although she did indicate that "[i]f [the computer-printed application] automatically included a date that wasn't manually typed in, it would've put 12/1." Such testimony does not indicate that an original date of December 1 was "likely," nor does it "corroborate" the Rollers' contention that the effective date was December 4. It simply points out that Hagen's computer program automatically inserts the date the application was printed as the effective date if that date is not manually changed. Accordingly, Simmons's testimony that December 10 was the original date is the only direct evidence concerning the actual date that appeared in the application before it was changed.

Haynes testified that on December 11 she changed the application's effective date to December 12 because the premium financing funds were received on December 11 and the underwriter would not "bind coverage" until twenty-four hours after the completed application is submitted. This testimony was corroborated by Don Simmons. Hagen argues that this testimony indicates that the effec-

tive date was changed "for a perfectly logical and appropriate (and uncontroverted) purpose." Indeed, Roller cites no evidence that suggests Hagen changed the effective date to undermine Roller's case. We discern no malice or reckless indifference on the part of Hagen. The superior court therefore did not err by granting the directed verdict motion on the issue of punitive damages.

## IV. CONCLUSION

For these reasons, we AFFIRM the judgment.