SOUTHERN ALASKA CARPENTERS
HEALTH AND SECURITY TRUST
FUND, Appellant/Cross–Appellee,

v.

Sara JONES and Justin Jones and
Janssen Contracting Co., Inc.,
Appellees/Cross–Appellants.

Nos. S–11360, S–11379, S–11380.

Supreme Court of Alaska.

March 7, 2008.

Bradley D. Owens, Thomas A. Ballantine, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellant/Cross–Appellee.

William Grant Callow, Law Offices of William Grant Callow, Anchorage, for Appellees/Cross–Appellants Sara and Justin Jones.

Mary L. Pate, Eide, Gingras & Pate, P.C., Anchorage, for Appellee/Cross–Appellant Janssen Contracting Company, Inc.

Before: MATTHEWS, EASTAUGH, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

An employee was told by his employer and a union-sponsored trust that he would be covered by health insurance, but their representations turned out to be false. The superior court found the employer and the trust liable for negligent misrepresentation and awarded compensatory damages, including damages for emotional distress. The main

questions presented in this appeal are whether the claim is preempted by the Federal Employee Retirement Income Security Act (ERISA) of 1974 and whether the award of emotional distress damages was justified. We find no error on either point, and affirm.

## I. FACTS AND PROCEEDINGS

### A. The Southern Alaska Carpenters Health and Security Trust Fund

The Southern Alaska Carpenters Health and Security Trust Fund (Trust) is a trust established to provide employee benefits, including health insurance, to the members of certain labor organizations. It is governed by a trust agreement and is administered by a board of trustees (Trustees). At the times relevant to this case, Carol Patton was the administrator of the Trust, and Charlene Renz was her assistant.

Under the trust agreement, the Trust provides benefits to the members of three local carpenters unions and to the members of other labor organizations that the Trustees designate. The Trust may also provide benefits to the nonunion staff of employers that have collective bargaining agreements with the designated labor organizations. But such coverage is only provided if an employer enters into a "special agreement" with the Trust that provides for such coverage.

In 1991 the Trust merged with the Alaska Bricklayers Health and Welfare Trust. Under the terms of the merger, employers and labor organizations who prior to 1991 were participants in the bricklayers trust became participants in the Trust. At the time relevant to this case the administrator for the bricklayers trust was Betty O'Dell.

### B. Janssen Contracting Co., Inc.

Janssen Contracting Co., Inc. (Janssen) is a construction business controlled by George Janssen. Janssen is a party to a collective bargaining agreement with the bricklayers union and made regular contributions to the Trust on behalf of its union employees. Donna Freitas was the bookkeeper for Janssen.

Each month Janssen contributed to the Trust on behalf of its union member employees. The amount was based on the number of hours that each union member worked for Janssen during the month in question. To make the monthly contribution, Freitas would prepare a "monthly remittance report," containing the names and hours worked of the employees for whom Janssen made contributions. Freitas would submit the report to the Trust's bank along with a check. The bank would deposit Janssen's checks and send copies of the transaction and the remittance report to the Trust. When Freitas had questions, she would request help from O'Dell of the merged bricklayers trust.

At the Trust, Renz would receive the report. From the report, Renz would prepare a list of employees who were eligible for coverage and send the eligibility lists to Administrative Services, Inc., the business that the Trust hired to process contributions and pay them to plan providers. Shirley Pelliteri was the employee at Administrative Services assigned to receive eligibility lists and transmit them with corresponding premium payments to plan providers.

In the late 1980s, Janssen began to make contributions to the bricklayers trust on behalf of its nonunion employees. After the merger, the Trust continued to accept these contributions. But Janssen and the Trust did not enter into a special agreement that included nonunion employees. This failure gave rise to the present case.

### C. Justin and Sara Jones

In 1997 Janssen offered a job to Justin Jones. At the time, Justin was working for a company that provided health insurance to him and his wife Sara. Justin's employment with Janssen was to be as a project engineer, a nonunion position. Janssen promised to provide him with a health care plan through the Trust. In April 1997 Justin accepted the position with Janssen.

There was a gap between the time when Justin's former employer would no longer provide the Joneses with health insurance and when the Trust health insurance would become effective. Freitas told Justin that Janssen would not be able to provide health insurance to the Joneses for Justin's first

ninety days of employment. To fill this gap, Justin purchased COBRA insurance. Justin was particularly concerned about insurance coverage because Sara was pregnant.

Justin began to work for Janssen in May 1997. Within weeks of beginning employment, Justin asked Freitas when coverage would begin and was assured by Freitas that this would occur on September 1, 1997. Between this initial inquiry and late August 1997, Freitas confirmed for Justin on a number of occasions that coverage would begin on September 1. To verify that this was so Freitas called the Trust and would speak to either Patton or Renz, who assured Freitas that the Joneses' coverage would indeed begin on September 1.

In late August 1997, however, the Joneses learned that Janssen's promised coverage would not begin until October 1, 1997. Around this time, Justin had again asked Freitas to confirm the September 1 start date. Freitas called the Trust and, according to Justin's testimony, spoke to Patton, who told Freitas that the insurance would begin October 1, 1997.

In mid-September 1997 Janssen began its attempts to make contributions to the Trust on the Joneses' behalf. Freitas called O'Dell to find out how to make such contributions for Justin. Following O'Dell's instructions, Freitas prepared and submitted a monthly remittance report that reported Justin had worked 100 hours for each of the last three months.

The Trust received and processed this report. In accordance with the normal practice for monthly remittance reports, Renz entered Justin's reported hours into the Trust's computer records. Renz testified that while she found it a bit unusual for Janssen to report hours for three separate months in one monthly remittance report, it was not so extraordinary that she thought much of it.

In contrast, Patton took notice. Evidently 100 hours per month is the minimum time required for coverage. The report of the exact minimums for three months running raised a "red flare" for her, and she suspected that something was amiss. Patton ordered an audit of Janssen's books and records. Pending the audit a freeze was ordered on any claims for medical insurance that the Joneses might submit. Neither Patton nor anyone else from the Trust communicated these problems to the Joneses.

Meanwhile, Sara, concerned, but unaware of the freeze on the Joneses' insurance, inquired whether the insurance would cover her pregnancy. Sara first called Freitas, who confirmed that the insurance would begin on October 1, but did not know whether the insurance would cover Sara's pregnancy. Sara then called Patton. Although Patton knew that the Trust had frozen the Joneses' insurance, she did not mention this. Instead, she confirmed to Sara that the insurance would begin on October 1. However, Patton too did not know whether the insurance would cover Sara's pregnancy, so Patton referred Sara to Pellitteri of Administrative Services. Pellitteri confirmed that the Joneses' insurance would begin on October 1 and that the insurance would cover Sara's pregnancy.

In early October 1997, after receiving confirmations from Janssen, the Trust, and Administrative Services that their health insurance would begin on October 1, the Joneses canceled their COBRA coverage.

### D. The Joneses' Medical Insurance Claim

On November 4, 1997, Sara gave birth to a son, Tyler. Tyler was born with Down syndrome and other problems. Sara was confined to the hospital for several days following the birth. Within a week of the birth, Justin sent to the Trust forms notifying the Trust that it would need to add Tyler to the Joneses' health insurance.

Soon after Tyler's birth, the Joneses began to learn of problems with their health insurance coverage. The hospital began to question the Joneses about it. Also, Freitas told Justin that the Trust had called Janssen with questions about Tyler's condition.

In February the Joneses signed up Tyler for TEFRA, a state insurance plan under which the state paid for Tyler's expenses. From November 4, 1997, to May 31, 1999,

TEFRA paid nearly $60,000 of Tyler's expenses.

The Trust moved slowly to resolve the question of whether it would provide health insurance to the Joneses. In February Patton sent Sara a letter stating that there was a problem with coverage. This was followed by a letter in late May of 1998 that formally disclaimed coverage. The letter explained that under the trust agreement and federal law, the Trust could not provide health insurance to a nonunion employee without a special agreement. The letter also apologized for the delay in making this determination, blaming the delay on Janssen's failure to cooperate with an audit. At this point the Trust also terminated the participation in the plan of Janssen's other nonunion employees.

In August 2000 the Federal Department of Labor sent the Trust a letter of admonishment. The department faulted the Trust for providing benefits to Janssen's nonunion staff without a special agreement in violation of the trust agreement. The department stated that this constituted a violation of ERISA. However, the department concluded that it would not pursue legal action since the Trust had taken measures to prevent similar occurrences in the future.

### E. Proceedings

In June 1999 the Joneses filed a complaint in superior court against Janssen and the Trustees for misrepresenting that the Joneses were covered by health insurance. At this point Justin was no longer an employee of Janssen.

The Trustees, with Janssen's consent, removed the suit to the United States District Court for the District of Alaska. They alleged that ERISA preempted the Joneses' state law claims and provided the district court with subject matter jurisdiction. The Joneses moved to remand the case to the superior court. United States District Court Judge John K. Sedwick granted this motion. Judge Sedwick issued a written opinion, portions of which we refer to later in this opinion.

On remand, the Joneses filed an amended complaint, adding several defendants, including the Trust. The Trustees moved for summary judgment on the ground that section 514 of ERISA preempted the Joneses' claims. They also filed a separate motion for summary judgment claiming that the factual basis for a misrepresentation claim was lacking. The Joneses filed a cross-motion for summary judgment on their claim of negligent misrepresentation against the Trustees. The superior court granted summary judgment for the Joneses on their negligent misrepresentation claim against the Trustees and denied all other summary judgment motions.

The case was then tried to the court without a jury. The court concluded that Janssen was liable for negligent misrepresentation and reaffirmed its summary judgment conclusion that the Trustees were also liable for negligent misrepresentation. The court awarded the Joneses $86,081.58. This award consisted of $56,081.58 in net medical costs [1] and $30,000 in damages for emotional distress. The court allocated seventy-five percent of the fault for the Joneses' losses to the Trustees and twenty-five percent to Janssen. The court reasoned that the Trustees were akin to an insurance company and Janssen was a lay consumer; the Trustees were thus better positioned than Janssen to discover and remedy the absence of a special agreement. The court also awarded attorney's fees against Janssen and the Trustees based on their respective shares of responsibility.

Janssen, the Joneses, and the Trust now appeal. The following questions are presented: (1) whether section 514 of ERISA preempted the Joneses' state law claims; (2) whether the court erred by awarding damages for emotional distress; (3) whether the court erred by holding Janssen liable for negligent misrepresentation; (4) whether the court erred in its apportionment of liability; (5) whether the award of $30,000 in emotional

---

1. The court found that medical costs for Tyler from his birth until May 31, 1999, were $57,729.86, and medical costs for Sara for the same period were $4,021.72. The court deducted from the total of these amounts $5,670 which represented the $315 per month cost of COBRA coverage for the eighteen-month period in question that the Joneses would have paid.

distress damages—$15,000 for each of the Joneses—is inadequate; and (6) whether the superior court abused its discretion by declining to award punitive damages.

## II. DISCUSSION

### A. The Trust Has Standing To Appeal.

■ The superior court awarded damages against the Trustees. However, the Trust—not the Trustees—now appeals. The Joneses argue that the Trust has no standing to appeal since the superior court did not award damages against the Trust.

We disagree. No individual Trustees were made parties to this suit and no argument was presented that the Trustees constituted a legal entity separate from the Trust. The Joneses' cross-motion for summary judgment and supporting memorandum referred to the Trustees and the Trust together. When speaking to the acts of the Trust employees, the memorandum referred to "the Defendant Trusts/Trustees, through their employees" and made no effort to distinguish whether the employees were employed by the Trustees or the Trust. The superior court's decision is based on the assumption that the Trustees and the Trust are the same entity. As no persuasive argument to the contrary has been presented, we proceed on the same assumption.

### B. Section 514 of ERISA Does Not Preempt the Joneses' State Law Claims.

■ The Trust is an employee benefit fund regulated by the Federal Employee Retirement Income Security Act (ERISA).[2] The Trustees argue that the Joneses' claims

for negligent misrepresentation are preempted by section 514 of ERISA.[3]

Section 514 of ERISA contains an express preemption section stating that "(a) ... the provisions of this subchapter ... shall supersede any and all State laws insofar as they ... relate to any employee benefit plan." "State laws" are defined broadly to include "all laws, decisions, rules, regulations, or other State action having the effect of laws of any State."[4] The question presented therefore is whether Alaska's common law right of recovery for negligent misrepresentation is, in the context of this case, "related" to the Trust Fund within the meaning of section 514. If it is, it is superceded.[5]

Another section of ERISA, section 502, also gives rise to a type of preemption. Section 502 permits a participant, beneficiary, or fiduciary to bring a civil action to enforce plan provisions or provisions of ERISA[6] or to enjoin acts which violate plan provisions or provisions of ERISA.[7] It vests exclusive jurisdiction to hear such claims in the federal courts, except for claims of participants or beneficiaries to recover benefits.[8]

Judge Sedwick remanded this case to the superior court based on lack of jurisdiction under section 502. Judge Sedwick reasoned that because the Joneses had not pled a federal cause of action, removal would only be appropriate if there was "complete preemption." "Complete preemption," Judge Sedwick wrote, occurs "only if ERISA preempts the applicable state law [a reference to section 514 preemption] and the claimant is within the scope of ERISA's civil enforcement provision, 29 U.S.C. § 1132(a) [section 502]." Since Judge Sedwick found the latter condition to be lacking, he had no occasion to rule on whether preemption by

2. 29 U.S.C. §§ 1001–1461.

3. 29 U.S.C. § 1144(a).

4. 29 U.S.C. § 1144(c)(1).

5. In *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), the United States Supreme Court described the purpose underlying section 514(a):

 Section 514(a) was intended to ensure that plans and plan sponsors would be subject to a

uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government. Otherwise, the inefficiencies created could work to the detriment of plan beneficiaries.

6. 29 U.S.C. § 1139(a)(3)(B)(ii).

7. 29 U.S.C. § 1139(a)(3)(A).

8. 29 U.S.C. § 1139(e)

supersession under section 514 would apply. In concluding that complete preemption did not exist, Judge Sedwick relied on a Ninth Circuit case, *The Meadows v. Employers Health Insurance*,[9] that held that the other prong of the complete preemption test—supersession of state law—was not satisfied. We quote part of Judge Sedwick's discussion concerning *The Meadows*:

> In *The Meadows v. Employers Health Insurance*, the Ninth Circuit determined that a third-party health care provider's state law claims pled against a health care insurer and alleging causes of action for negligent misrepresentation, estoppel, and breach of contract were not preempted by ERISA. In that case, the third-party provider was trying to recover the costs it incurred in treating a patient for substance abuse. The third-party provider's claims were based on repeated representations by the health care insurer that the patient was covered by an ERISA plan. Relying on those representations, the provider treated the patient. The insurer subsequently denied the provider's claims because, in fact, the patient was not covered by the plan. The Ninth Circuit reasoned that the third-party provider's state law

claims did not "relate to" an ERISA plan because neither the third-party provider nor the patient had any connection to an ERISA plan at the time of treatment. (Citations omitted.)

The Ninth Circuit's decision in *The Meadows* is representative of a number of cases where courts have held that negligent misrepresentation claims against ERISA entities may be maintained. Often such cases involve third-party health care providers who have relied on misrepresentations as to coverage made by ERISA insurers.[10] But misrepresentation claims asserted by employees have also been allowed, especially when the employees are not plan participants or beneficiaries.[11]

One such case that in some respects resembles the present case is *Smith v. Texas Children's Hospital*.[12] Smith, an employee of another hospital, was induced by a related corporation to work for Texas Children's Hospital. Texas Children's promised that Smith's existing long-term disability benefits would be duplicated at Texas Children's.[13] This promise turned out to be untrue, as Smith discovered when she became disabled. She sued Texas Children's for fraudulent

9. 47 F.3d 1006 (9th Cir.1995).

10. See in addition to *The Meadows*, 47 F.3d 1006, *Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1532 (11th Cir.1994) ("ERISA does not preempt a third-party health care provider's negligent misrepresentation claim against an ERISA plan administrator."); *Hospice of Metro Denver, Inc. v. Group Health Ins. of Oklahoma, Inc.*, 944 F.2d 752, 756 (10th Cir.1991) (allowing third-party state law action based upon misrepresentation by insurance carrier); *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 250 (5th Cir.1990) (third-party health care provider seeking damages from an insurance company for negligent misrepresentations not preempted by ERISA); *Alliance Health of Santa Teresa, Inc. v. Nat'l Presto Indus., Inc.*, 137 N.M. 537, 113 P.3d 360, 363–64 (App.2005) (third-party healthcare provider suit for breach of contract, fraud, and promissory estoppel not preempted). There is also contrary authority. According to one commentator, "the leading case finding preemption of misrepresentation of coverage causes of action is *Cromwell v. Equicor–Equitable HCA Corp.*," 944 F.2d 1272 (6th Cir. 1991). This case is said to represent "the minority view." Scott C. Walton, Note, *ERISA Preemption of Third–Party Provider Claims: A Coherent*

*Misrepresentation of Coverage Exception*, 88 IOWA L.REV. 969, 983 (2003).

11. See in addition to *Smith v. Texas Children's Hospital* discussed in the text immediately following this note, *Hobson v. Robinson*, 75 Fed. Appx. 949 (5th Cir.2003) (unpublished) (claim of employee against agent and plan provider for negligent misrepresentation of coverage not preempted); *Wilson v. Zoellner*, 114 F.3d 713, 718 (8th Cir.1997) (employee's suit for misrepresentation of coverage against agent of insurance company not preempted by ERISA even though insurance company could be liable for the agent's misrepresentation: "If Prudential incurs any liability as a result of this suit, it will do so only as the employer of a tortfeasor, and not as a plan fiduciary."); *Smith v. Cohen Benefit Group, Inc.*, 851 F.Supp. 210, 213 (M.D.N.C.1993) (negligent misrepresentation claim by employee not preempted); *Martin v. Pate*, 749 F.Supp. 242, 246 (S.D.Ala.1990), *aff'd sub nom. Martin v. Cont'l Investors*, 934 F.2d 1265 (11th Cir.1991) (fraud-in-inducement claim by non-beneficiary against group health insurer not preempted).

12. 84 F.3d 152 (5th Cir.1996).

13. *Id.* at 153.

inducement based on its misrepresentation of coverage.[14] Texas Children's removed the case to federal court and asserted an affirmative defense based on section 514 of ERISA. The district court held that her claim was not preempted by ERISA and remanded the case to state court.[15] On appeal the Fifth Circuit also held that Smith's misrepresentation-based claim was not preempted.[16] The court noted that Smith's claim would be preempted if she were claiming entitlement to benefits under Texas Children's ERISA plan.[17] But since her claim was for benefits that she gave up based on Texas Children's misrepresentation, her claim could be maintained:

> We are persuaded that ERISA preemption would not apply to such a claim. Smith alleges that, because she relied upon misrepresentations by Texas Children's, she lost a quantifiable stream of income that she would now be receiving had she never left St. Luke's. Such a claim escapes ERISA preemption because it does not necessarily depend upon the scope of Smith's rights under Texas Children's ERISA plan. For example, if Texas Children's did not have any benefits plan, ERISA would not apply, leaving Smith with a non-preempted claim based upon the benefits relinquished. That Texas Children's has such an ERISA plan does not alter the nature of her claim, which is based upon benefits given up for purposes of ERISA preemption. The ultimate question of Texas Children's liability for fraudulently inducing Smith to leave St. Luke's turns not on the quantum of benefits available at Texas Children's, but on the question whether Texas Children's misled Smith when it told her that she would keep what she had.[18]

Based primarily on the case law permitting negligent misrepresentation claims against ERISA entities of which *The Meadows* and *Texas Children's* are representative, we conclude that there is no ERISA preemption in this case. We must rely heavily on case law because as the United States Supreme Court has recognized, the "relate to" language of section 514 is not especially helpful in determining the outer limits of preemption:

> The governing text of ERISA is clearly expansive. Section 514(a) marks for preemption "all state laws insofar as they ... relate to any employee benefit plan" covered by ERISA, and one might be excused for wondering, at first blush, whether the words of limitation ("insofar as they ... relate") do much limiting. If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for "[r]eally, universally, relations stop nowhere[.]" But that, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality. That said, we have to recognize that our prior attempt to construe the phrase "relate to" does not give us much help drawing the line here.[19]

Even though the reach of section 514's "relate to" language is not ascertainable from the text of the statute, decisions interpreting section 514 are generally clear in holding certain recurring fact patterns to be within the scope of the section. For example, state laws that refer to employee benefit plans and affect their administration are preempted.[20] The same is true of state law claims that involve the right to receive benefits under the terms of an ERISA plan or require the interpretation of an ERISA plan.[21]

14. *Id.* at 154.

15. *Id.*

16. *Id.* at 155.

17. *Id.*

18. *Id.* at 155–56.

19. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S.

645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (citation omitted).

20. *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138–39, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

21. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

Beyond these categories generalizations as to the scope of section 514 are problematic. Some state laws affect employee benefit plans "in too tenuous, remote or peripheral a matter to warrant a finding that the law 'relates to' the plan."[22] Moreover, the Supreme Court has held that "lawsuits against ERISA plans for run-of-the-mill state-law claims" are not preempted by section 514 of ERISA.[23] But whether a particular relationship is too tenuous or a suit involves a "run-of-the-mill" state-law claim is often difficult to say. In the two cases we decided under section 514 we were faced with these difficulties.

In *Alaska State Council of Carpenters v. United Brotherhood of Carpenters & Joiners of America, Local 1281*, the issue was whether state law governing how organizations select their board members would apply to the question of whether a trustee of an ERISA organization had been properly replaced.[24] We held that there was no ERISA preemption, noting that the applicable state law in question—"contract law and the law governing the functioning of organizations"—was an area of traditional state regulation that Congress probably did not intend to supersede: "If the organizations which appoint ERISA trustees are not subject to state law on matters not covered by ERISA, they are, for the most part, not subject to any law at all."[25]

Eight years after our *Local 1281* decision we had another occasion to interpret section 514. In *Andrews v. Alaska Operating Engineers–Employers Training Trust Fund*, a trust employee claimed that he had been discharged to prevent him from reporting the misuse of trust funds by a trustee.[26] We agreed that preemption of this claim was appropriate, noting: "Courts addressing ERISA preemption in this context have uniformly held that state law retaliatory discharge and whistleblower claims based on alleged violations of public policy 'relate to' ERISA plans and are thus preempted."[27] We also held that the employee's claim was preempted under section 502(a) of ERISA because that section provided a remedy for the employee: "In addition, ERISA provides the exclusive remedy for the wrong alleged by Andrews. As a fiduciary, Andrews is authorized under [section] 502(a) to bring a civil action in federal district court to enforce ERISA's retaliatory discharge provision."[28]

This case does not fall within the fact patterns of claims that are categorically preempted under section 514. The common law of misrepresentation is a law of general application; it does not entail any elements that make what might be regarded as a specific reference to employee benefit plans.[29] Further, this case does not involve a claim for benefits under an ERISA plan or require the interpretation of a plan.[30] As one court stated in an analogous situation, "[t]he existence of the Plan is not a critical factor to establishing liability because the same causes of action would exist if the Plan had never come into existence or was merely a fraudulent scheme."[31]

Not only does this case not fit within the categorically barred fact patterns suggested by the case law, a number of other factors point to nonpreemption. The Joneses are not participants or beneficiaries of an ERISA plan and as such have no claim under

**22.** *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

**23.** *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 833, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (state law claims such as "unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan ... are not pre-empted").

**24.** 727 P.2d 306 (Alaska 1986).

**25.** *Id.* at 310.

**26.** 871 P.2d 1142 (Alaska 1994).

**27.** *Id.* at 1144–45.

**28.** *Id.* at 1147 (citation omitted).

**29.** *See Ingersoll*, 498 U.S. at 139, 111 S.Ct. 478 (suggesting limited scope of ERISA preemption when dealing with laws of general application).

**30.** The claim on which the judgment under review is based is for benefits that the Joneses would have received under their existing health insurance had they not been induced by misrepresentations concerning new coverage to give up the existing insurance. *See supra* note 1.

**31.** *Smith v. Cohen Benefit Group, Inc.*, 851 F.Supp. 210, 213 (M.D.N.C.1993).

ERISA.[32] Preemption in this case would deny the Joneses any remedy for the harm that they suffered.[33] Finally, and relatedly, the common law of negligent misrepresentation is an area of traditional state concern.[34] Each of these factors points, albeit not conclusively, toward a conclusion that this case should not be considered preempted by section 514.

Based on the reasons stated above and the foregoing authorities we conclude that section 514 of ERISA does not preempt the Joneses' claims.

## C. Were Damages for Emotional Distress Justified?

The other main issue presented by this case is whether the $30,000 award to the Joneses for their emotional distress was legally and factually justified.

The trial court in this case ruled that the Joneses suffered severe emotional distress between the time of Tyler's birth and the time that the state agreed to pay for Tyler's medical bills. The court awarded Justin and Sara $15,000 each for the emotional distress they experienced during this period.[35]

Janssen challenges this award, arguing that it was legally unjustified because in the absence of physical injury no award for the negligent infliction of emotional distress can be made unless the defendant has a pre-existing duty to the plaintiff which, if breached, would foreseeably result in emotional harm to the plaintiff. Such a duty is absent

32. *See Harris v. Provident Life & Accident Ins. Co.*, 26 F.3d 930, 933 (9th Cir.1994) (non-participant in ERISA lacks standing to claim an injury under ERISA); *see also The Meadows v. Employers Health Ins.*, 47 F.3d 1006, 1009 (9th Cir. 1995) (finding the fact that employees did not have ties to an ERISA plan as relevant to showing claim did not "relate to" ERISA plan).

33. *See Hospice of Metro Denver, Inc. v. Group Health Ins. of Oklahoma, Inc.*, 944 F.2d 752, 755 (10th Cir.1991) (for entity that is "not a participant or a beneficiary ... lack of alternate remedies in the event of preemption is deserving of consideration"); *see also Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 248 n. 16 (5th Cir.1990) (noting that "[o]ther courts have reasoned that a lack of available remedies is an important consideration in determining if Congress intended a particular state law to be preempted in a particular factual situation" and citing cases).

34. *See, e.g., Associated Builders & Contractors of S. California, Inc. v. Nunn*, 356 F.3d 979, 984–85 (9th Cir.2004) (Congress did not intend ERISA to preempt regulation in areas of traditional state concern). *See generally* Karen A. Jordan, Travelers Insurance: *New Support for the Argument to Restrain ERISA Pre-emption*, 13 Yale J. Reg. 255, 305 (1996) (state common law claims should be accorded a "weighty presumption against preemption" because they are within the domain of "traditional state powers").

35. The court stated concerning its award of emotional distress damages:
The Joneses also seek a recover[y] for the emotional distress they experienced as a result of the defendant's conduct. Under Alaska law, the plaintiffs can recover only if there is proof of severe emotional distress. The unique facts of this case are compelling. The evidence re-

flects that despite their young age, the Joneses were extremely careful about securing health insurance to cover the birth of their child. On the eve of Tyler's birth, there was no reason for the Joneses to be concerned about the child's health or the fact that there was adequate coverage for what might lay ahead. Of course, Tyler's birth was complicated and expensive. He had digestive and heart problems initially and later proved to have Down Syndrome. Tyler's severe medical needs were unanticipated and no doubt shocking and disturbing to his parents. Without question, even if all of their medical bills had been paid, the plaintiffs would have experienced great anxiety and distress as a result of Tyler's birth. But while the Joneses were dealing with this extremely tragic situation, they learned that their expectation concerning health insurance was misplaced. This young couple of modest means had reason to fear that they would be saddled with enormous medical bills that should have been covered by insurance. The court finds by a preponderance of the evidence that in this situation, a reasonable person would experience severe emotional distress and in this particular case Sara and Justin Jones did experience severe emotional distress. Fortunately, in February, 1998, Sara learned that the State of Alaska would be able to pay Tyler's medical bills and this was subsequently accomplished. Had this not occurred, the plaintiffs' harm would have been extraordinary. The court therefore focuses on the period between the time of Tyler's birth and the time the State agreed to pay his medical bills. And this of course is a relatively brief time so recognizing the severe emotional distress experienced by the plaintiffs and the relatively brief time that they would have experienced that, the court award[s] each of the plaintiffs $15,000.

in this case, according to Janssen, because its "run of the mill employment agreement" with Justin does not fit the pre-existing duty requirement.

The Trust makes a similar argument. It contends that the pre-existing duty that is required for emotional distress damages must be based on either a contractual or fiduciary relationship, neither of which existed between the Joneses and the Trust. The Trust also argues that the Joneses did not present evidence of emotional distress that was sufficiently severe to justify an award of emotional distress damages.

The Joneses respond by arguing that misrepresentations concerning health insurance can with ready foreseeability lead to emotional distress. They also contend that the emotional distress they suffered was severe.

██ The seminal case on damages for emotional distress in the absence of physical injury in Alaska is *Chizmar v. Mackie*.[36] The plaintiff in *Chizmar* was misdiagnosed by her physician as having AIDS. The physician reported this misdiagnosis not only to the plaintiff but to her husband, without authorization from the plaintiff.[37] Plaintiff brought a claim against her physician for emotional distress damages.[38] At trial the superior court directed a verdict against the plaintiff on such damages since the plaintiff did not suffer physical injury.[39] On appeal, we reversed holding that when a defendant stands in a pre-existing relationship with the plaintiff and a breach of the duties arising from this relationship would foreseeably result in emotional harm to the plaintiff, an accompanying physical injury is not a prerequisite for the recovery of damages for emotional distress.[40]

In *Chizmar* we referred to an earlier case, *Hancock v. Northcutt*,[41] in which we held that a plaintiff may not recover damages for negligently caused emotional distress arising out of the negligent performance of a contract to build a house. We stated in *Chiz-*

*mar* in explanation of our immediate holding and with reference to *Hancock*:

> We do not believe that the traditional tort principle of foreseeability, standing alone, properly defines the scope of a defendant's duty in an action for damages for negligently inflicted emotional distress. See *Hancock*, 808 P.2d at 258. Rather we believe that a plaintiff's right to recover emotional damages caused by mere negligence should be limited to those cases where the defendant owes the plaintiff a preexisting duty. In *Hancock*, we recognized that a plaintiff may recover emotional distress damages in certain cases where a contractual relationship exists between the parties. *Id.* at 258. In holding that the contract at issue in *Hancock* did not imply such a duty, we observed:

> > In our view, breach of a house construction contract is not especially likely to result in serious emotional disturbance. Such contracts are not so highly personal and laden with emotion as contracts where emotional damages have typically been allowed to stand on their own. Examples of the latter include contracts to marry, to conduct a funeral, to sell a sealed casket, to conduct a cesarean birth, to surgically rebuild a nose, *to provide promised maternity coverage, to provide medical services,* and to keep a daughter informed of her mother's health.

*Id.* at 258–59 (footnotes omitted) (emphasis added). Under *Hancock*, whenever a defendant stands in a contractual or fiduciary relationship with the plaintiff and the nature of this relationship imposes on the defendant a duty to refrain from conduct that would foreseeably result in emotional harm to the plaintiff, the plaintiff need not establish a physical injury in order to recover for the negligent infliction of emotional distress.

---

**36.** 896 P.2d 196 (Alaska 1995).

**37.** *Id.* at 199–200.

**38.** *Id.* at 200.

**39.** *Id.*

**40.** *Id.* at 213.

**41.** 808 P.2d 251 (Alaska 1991).

A growing number of jurisdictions have adopted this approach.[42]

Based on the above language, it is apparent that an undertaking to provide medical services, particularly one that provides coverage to a pregnant woman, qualifies as just the sort of emotionally laden promise which, if not fulfilled, properly may give rise to emotional distress damages. The requirement of foreseeability established in *Chizmar* is therefore satisfied.

In the case of Janssen, the pre-existing contractual relationship requirement of *Chizmar* is also met. Janssen was Justin's employer. Providing health insurance was an important part of the employment contract, and Janssen's misrepresentations concerning coverage caused the Joneses to cancel their existing coverage.

The Trust likewise made a negligent misrepresentation concerning medical coverage and did so specifically with respect to coverage for Sara's pregnancy. Thus the foreseeability element of the *Chizmar* test was met. But there is considerable doubt as to whether the pre-existing duty requirement of *Chizmar* was also satisfied with respect to the Trust. All parties believed, for a time, that there was a contractual relationship between Janssen and the Trust under which the Trust would provide coverage for the Joneses. If this belief, in fact, had been true, the pre-existing duty requirement could have been satisfied. But, as we now know, this was not the case.

Nonetheless, we think that because both *Chizmar* requirements were satisfied as to the claim against Janssen, the award against the Trust must be allowed to stand. The Trust, as the trial court found, not only made negligent misrepresentations on its own, it also bore a heavy responsibility for the negligent misrepresentations made by Janssen. It would be anomalous to hold that the Trust—the party most responsible for the misrepresentations—is not responsible for emotional distress damages while holding the less responsible party—Janssen—liable. If the claim against the Trust for emotional distress damages was found wanting because of failure to meet the pre-existing duty requirement, this holding would mean that Janssen would have to pay the full amount of the damages. This result would be unjust to Janssen.

In part, the requirement of a pre-existing relationship was imposed as a screening device in an effort to separate worthy claims for emotional damages from unworthy ones.[43] That purpose is served by focusing on the relationship between the Joneses and Janssen. The bona fides of the Joneses' claims are not made stronger by requiring the Joneses also to have a pre-existing relationship with the Trust. Indeed, if the Trust had not been sued by the Joneses or joined by Janssen in an action for equitable apportionment under Alaska Civil Rule 14(c), Janssen would have borne full responsibility for the whole award of emotional distress damages to the Joneses.

Both Janssen and the Trust also argue that the Joneses' damages were not sufficiently severe to give rise to emotional distress damages. This decision is ultimately a question of fact. The trial judge explicitly addressed it, finding that both Joneses experienced severe emotional distress. In our view this finding is not clearly erroneous.[44]

For the above reasons we believe that the award of emotional distress damages of

---

**42.** *Chizmar,* 896 P.2d at 203 (footnote omitted) (first emphasis added).

**43.** *See id.* at 202.

**44.** There was evidence that the distress experienced by Sara caused her to cease lactating in addition to causing her loss of sleep and dietary problems. Both Joneses testified that the lack of coverage and related financial issues was a major contributing factor to their eventual divorce. Sara also testified that the lack of coverage resulted in incessant calls from creditors and ultimately forced her to file for personal bankruptcy.

The clearly erroneous standard of review governs this and the other questions of fact involved in this appeal. Under this standard, "[w]e review ... factual findings for clear error. We will find clear error only if, after a thorough review of the record, we come to a definite and firm conviction that a mistake has been made." *Afognak Joint Venture v. Old Harbor Native Corp.,* 151 P.3d 451, 456 (Alaska 2007) (citations omitted).

$15,000 for each of the Joneses was legally and factually justified.

### D. The Superior Court Did Not Err when Holding Janssen Liable to the Joneses for Negligent Misrepresentation.

 The tort of negligent misrepresentation comprises four elements.[45] First, the tortfeasor must have made a statement in the course of business, employment, or some other enterprise in which he had a pecuniary interest.[46] Second, the statement must have been false when the tortfeasor made it.[47] Third, the victim must have justifiably relied upon the statement to his detriment.[48] Fourth, the tortfeasor must have failed to exercise reasonable care when making the statement.[49]

The superior court held that Janssen's repeated assertions to the Joneses that it would provide them with health insurance through the Trust constituted actionable negligent misrepresentations. Janssen claims that this holding was error. It concedes that its conduct satisfied the first and third elements of the test of negligent misrepresentation but challenges the court's conclusion that its conduct satisfied the second and fourth elements. With respect to these elements, Janssen argues that its statements were neither false nor made without due care because it reasonably believed that it would provide the Joneses with health insurance. Janssen emphasizes that it had successfully provided other nonunion employees with coverage through the Trust.

 Whether Janssen's communications to the Joneses were false and negligent are questions of fact which we review under the clearly erroneous standard.[50]

With respect to whether the representations that the Joneses would be provided with health insurance were false, Janssen argues that the statements were true when made. Janssen contends that only the unexpected decision by the Trust to disqualify the Joneses (and Janssen's other office employees) resulted in their lack of coverage. Janssen argues that its statements were analogous to the statements made in *Bubbel v. Wien Air Alaska, Inc.*[51] There the employer hired Bubbel as a replacement pilot during a labor dispute. The employer represented to him that it intended to fight the striking pilots successfully and replacement pilots were going to be hired permanently.[52] Bubbel sued the employer for breach of contract and misrepresentation. The breach of contract claim was held superseded by a subsequent collective bargaining agreement under the provisions of federal labor law.[53] With respect to the misrepresentation claim, we held that the employer's statement as to the permanency of Bubbel's employment was true when made—the employer intended Bubbel to be a permanent employee. It was only later that the employer's position was changed when it was pressured by the presidential emergency board to settle the strike.[54] Thus the tort of negligent misrepresentation had not been established.

The superior court considered Janssen's "true when made" argument and rejected it:

> Janssen told Justin Jones that as an employee, he would have health insurance coverage. That representation was untrue because there was no health insurance coverage for Justin Jones through his employment with Janssen at the time he was hired or at any time thereafter. Hence, the second element is satisfied here.

45. *Bubbel v. Wien Air Alaska, Inc.*, 682 P.2d 374, 380 (Alaska 1984).

46. *Id.*

47. *Id.*

48. *Id.*

49. *Id.*

50. *See supra* note 44.

51. 682 P.2d at 381.

52. *Id.* at 376.

53. *Id.*

54. *Id.* at 381.

We see no problem with this reasoning, and thus conclude that the false information element has been satisfied.

■ Janssen also argues that the evidence was insufficient to establish the fourth element—failure to exercise reasonable care in obtaining or communicating the information. The superior court noted that Janssen had a duty to exercise due care in obtaining and maintaining health insurance coverage, and found that by taking a "casual hands off approach on insurance matters" Janssen had failed to satisfy this duty. Specifically, the court found that it was imprudent of Janssen to continue to rely on O'Dell of the bricklayer's trust after the merger with the carpenter's trust. The court also found that Janssen's attorney advised George Janssen that the Trust health plan would have to include all nonunion office employees rather than just some. The court found that "a reasonably prudent employer in Janssen's shoes presented with this information would have taken affirmative action to determine just what the SACTF health plan required. Some inquiry was necessary and Janssen made none whatsoever." Finally, the court found that the lack of written documentation concerning coverage was an indication of careless conduct:

> In addition, it is noteworthy that there is a complete lack of written documentation of communications between Janssen and the Health Insurance program or members of the Trusts or written documentation as to whose [sic] covered by the insurance plan, when they are covered and how they are covered. One would expect a prudent employer to have written documentation concerning matters of importance dealing with insurance.

Based on these findings the court concluded that Janssen did fail to exercise reasonable care or competence in obtaining or communicating the information concerning health care insurance. In other words, had Janssen exercised reasonable care in the area, it is more likely than not that Justin Jones would never have been told that he had health insurance coverage through Janssen Contracting.

As noted, whether Janssen failed to exercise reasonable care or competence in determining whether its representations to the Joneses concerning their health insurance coverage were correct was a question of fact. Although Janssen's position that it reasonably relied on Trust representations and practices is a sympathetic one, the trial court found that Janssen also had a responsibility to take affirmative action to determine the nature and extent of the health care coverage that it believed it was providing for its nonunion employees. Since we do not have a definite and firm conviction that the court was mistaken in making this determination, it must be affirmed.

### E. The Superior Court Did Not Err in Apportioning Seventy–Five Percent of the Damages to the Trustees and Twenty–Five Percent to Janssen.

■ The superior court apportioned seventy-five percent of the fault for the Joneses' damages to the Trustees and twenty-five percent to Janssen. Although the trial court observed that "there is a tie as to causation, and a tie as to the mundane ways in which these two entities dropped the ball," it justified placing a greater percentage of fault on the Trustees as follows:

> Janssen is a construction company, and as such is more akin to a lay consumer. The Trustees are *de* facto in the business of selling insurance, and are more akin to an insurance company. An insurance company holds itself out to have special competence in insurance matters, and a construction company does not.

The Trust and Janssen each challenge the superior court's allocation of fault. Each claims that a higher share should have been allocated to the other.

■ Whether a trial court has properly determined the percentage of fault of the actors in a tort claim under AS 09.17.080 is a question of fact, reviewed under the clearly erroneous standard. In our view the allocation was not clearly erroneous. As the superior court found, the Trust was better placed than Janssen to determine whether Justin Jones was eligible for coverage. Further, the Trust's act of accepting premiums on

behalf of nonunion employees of Janssen without protest until learning of the possibility of a very substantial claim based on Tyler Jones's condition is a logical basis for ascribing greater fault to the Trust. The same may be said for Patton's confirmation to Sara Jones that the Trust would be providing the Joneses with coverage at a time when Patton knew that a freeze had been placed on any claims the Joneses might submit.

Janssen argues that it should be liable at most for only ten percent of the Joneses' damages based on its reliance on the Trust's assurances and the Trust's past practices of accepting premiums for nonunion employees and paying their health care claims. While we agree that apportioning a smaller share of the overall liability to Janssen would not have been clearly erroneous, we are also unable to conclude that imposing a twenty-five percent share exceeded reasonable limits.

### III. CONCLUSION

▮ For the above reasons the judgment of the superior court is AFFIRMED.[55]

FABE, Chief Justice, and BRYNER, Justice, not participating.

---

**55.** The Joneses raise two issues that we determine summarily. They claim that $15,000 each in emotional distress damages to Justin and Sara Jones is inadequate as a matter of law. We conclude that the award is not clearly inadequate based on the facts and circumstances of the case. *See supra* note 44. The Joneses also argue that they are entitled to punitive damages as a matter of law against the Trust and Janssen. Punitive damages may only be awarded based on proof by clear and convincing evidence of outrageous conduct, including acts done with malice or bad motives, or conduct that evidences reckless indifference to the interests of another. AS 09.17.020(b). Here the trial court's conclusions that Janssen and the Trust were liable only for negligent misrepresentation precludes an award of punitive damages. In our judgment the record would not support a determination of more culpable reckless conduct as against Janssen. While the record might support such a determination against the Trust, the court's conclusion that the Trust was only negligent is not clearly erroneous.